IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | Case No. 06-10072 (CSS) |
| NELLSON NUTRACEUTICAL, INC., | ) | |
| et al., | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

MEMORANDUM OPINION[1]

Laura Davis Jones, Esquire
Curtis A. Hehn, Esquire
Rachel Lowy Werkheiser, Esquire
Pachulski, Stang, Ziehl, Young,
Jones & Weintraub
919 N. Market Street, 16th Floor
Wilmington, DE 19801

Brad R. Godshall, Esquire
Alan J. Kornfeld, Esquire (Argued)
Pachulski, Stang, Ziehl, Young,
Jones & Weintraub
10100 Santa Monica Boulevard, Suite 1100
Los Angeles, CA 90067

Counsel for Debtors and Debtors
in Possession

Robert S. Brady, Esquire
M. Blake Cleary, Esquire
Margaret B. Whiteman, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Kurt F. Gwynne, Esquire (Argued)
Thomas J. Francella, Jr., Esquire
Reed Smith, LLP
201 Market Street, 15th Floor
Wilmington, DE 19801

Claudia Springer, Esquire
Reed Smith, LLP
2500 One Liberty Place
650 Market Street
Philadelphia, PA 19103

Counsel for the Official Committee
of Unsecured Creditors

Richard W. Riley, Esquire
Duane Morris, LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801-1246

James J. Holman, Esquire
Duane Morris, LLP
30 South 17th Street
Philadelphia, PA 19103-4196

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

Fred S. Hodara, Esquire
Abid Qureshi, Esquire (Argued)
Akin, Gump, Strauss, Hauer & Feld
590 Madison Avenue
New York, New York 10022

Scott L. Alberino, Esquire
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036

Counsel for the Informal Committee
of First Lien Lenders

Linda Dakin-Grim, Esquire
Gregory A. Bray, Esquire
Thomas R. Kreller, Esquire
Jason B. Baim, Esquire (Argued)
Milbank, Tweed, Hadley & McCoy
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017

Counsel for UBS AG, Stamford Branch

Date: December 4, 2006

SONTCHI, J.

### Introduction

The Court recently concluded a trial to determine the Debtors' enterprise value. The issue before the Court is whether the opinion tendered by the Debtors' expert as to that value is admissible as an expert opinion under Rule 702 of the Federal Rules of Evidence.

The Third Circuit has explained that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F. 3d 396, 404 (3d Cir 2003). All three criteria must be met before the Court can admit the testimony into evidence. The Court previously ruled during trial that the Debtors' witness is qualified as an expert. Thus, the issues addressed in this opinion are reliability and fit, *i.e.*, whether the testimony is sufficiently reliable and relevant to be admissible as expert testimony.

The opinion of the Debtors' expert witness as to the Debtors' enterprise value is based entirely upon the performance of a discounted cash flow analysis ("DCF"). In basic terms, a DCF is the calculation of future cash flows multiplied by a discount factor to determine a present

value of those future cash flows.  All four experts in this case performed a DCF analysis as part

of rendering their opinion as to the Debtors' enterprise value.  In performing the DCF analysis,

all the experts divided the Debtors' future cash flows into two parts: (i)  the Debtors' "free cash

flows" for 2006 - 2011 (which were derived from the Debtors' long range business plan); and (ii)

the Debtors' terminal value as of the end of 2011.  To calculate a "terminal value" an expert

determines an appropriate metric of value and applies a multiple to that metric.  Three of the

experts used the Debtors' projected EBITDA (earnings before interest, tax, depreciation and

amortization) as the metric of value for determining the Debtors' terminal value.  The Debtors'

expert, however, used the Debtors' projected EBITDA minus capital expenditures ("EBITDA

minus Cap Ex") as the metric of value for determining the Debtors' terminal value.  The

evidence reveals, however, that this methodology is not generally accepted by experts in the field

of valuation and was, in fact, invented by the Debtors' expert for use in this case.  Applying the

well-settled law on the admissibility of expert testimony to these facts, the Court finds that the

unprecedented use by the Debtors' expert of EBITDA minus Cap Ex to determine the Debtors'

terminal value is so unreliable as to render the opinion of the Debtors' expert witness as to the

Debtors' enterprise value inadmissible.

Under Rule 702, expert testimony must be reliable _and_ relevant to be admissible.  Where

an expert relies on altered facts, speculation, and volatile projections or fails to consider relevant

facts in reaching a conclusion the expert's opinion can offer no assistance to the trier of fact and

is excluded as irrelevant.  Thus, an additional issue before the Court is the relevancy of the

opinion of the Debtors' expert.  Specifically, the movants contend that the Debtors' long range

business plan was manipulated by the Debtors' management in anticipation of this trial to bolster

3

the Debtors' enterprise value. The movants argue that the opinion of the Debtors' expert is irrelevant because it relies in its entirety on the Debtors' long range business plan, which the Debtors' expert knew or had reason to know had been manipulated and, thus, was unreliable. There is insufficient evidence before the Court, however, to render the expert opinion inadmissible on grounds of relevancy.

In this case, two of the three criteria for the admissibility of expert testimony are met: qualification and relevancy. The third criteria of reliability, however, is not satisfied. Thus, the opinion of the Debtors' expert witness as to the Debtors' enterprise value is inadmissible.

## Jurisdiction

The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## Statement of Facts

### Factual Background

On January 28, 2006, Nellson Nutraceutical, Inc. and certain of its affiliates (the "Debtors") filed voluntary petitions for relief under Chapter 11. The Debtors are leading formulators and manufacturers of functional nutrition bars and powders for the weight loss, sports training and wellness and medical categories. The Debtors do not manufacture products under their own label, but produce for leading food marketers under two to three-year exclusive contracts with pre-established pricing. According to management, the Debtors are the clear market leader in the formulation and manufacture of nutritional bars. The Debtors (together with their non-debtor Canadian affiliate) employ in excess of 1,200 persons and operate manufacturing facilities in Irwindale, California, Salt Lake City, Utah and Montreal, Canada.

4

The Debtors are privately held.  The ultimate equity owner is Freemont Investors VII, LLC ("Freemont"), which purchased the Debtors in 2002.  The Debtors have three tranches of debt: (i) first priority secured obligations under the Amended and Restated Credit Agreement dated as of July 2, 3003 (the "First Lien Debt"); (ii) second priority secured obligations under the Second Lien Credit Agreement dated as of February 11, 2004 (the "Second Lien Debt"); and (iii) unsecured obligations to trade vendors, lessors and others.  As of January 28, 2006, the Debtors' outstanding principal obligations under the First Lien Debt and Second Lien Debt totaled approximately $255 million and $75 million, respectively.  As of December 31, 2006, the secured creditors will be owed approximately $355 million in the aggregate, inclusive of fees, charges, and interest.  The Debtors' unsecured debt is approximately $10 million.  Thus, for equity to be "in the money" the enterprise value of the Debtors must exceed approximately $365 million.  As set forth more fully below, the Debtors' expert witness testified that the Debtors' enterprise value is $404.5 million, which places Freemont "in the money" by approximately $40 million.

UBS AG, Stamford Branch ("UBS") is the administrative and collateral agent under both the First Lien Debt and the Second Lien Debt.  In addition, certain holders of the First Lien Debt have formed an Informal Committee of First Lien Lenders (the "Informal Committee").  The interests of the unsecured creditors are represented by the Official Committee of Unsecured Creditors (the "Official Committee").  UBS, the Official Committee and the Informal Committee have all actively participated in the trial on the Debtors' enterprise value.  Although each of their experts disagree on many points, including their conclusions as to enterprise value, they all agree that the Debtors' enterprise value is less than $365 million and, thus, Freemont is "out of the

money."

## Procedural History

On April 28, 2006, the Debtors filed and served the Motion to Determine: (1) Enterprise

Value of Debtors, and (2) Secured Claims of Prepetition Secured Lenders Pursuant to Section

506(a) of the Bankruptcy Code; Notice of Status Conference and Request That Court Enter

Proposed Scheduling and Procedures Order in Respect Thereon [D.I. 333].  This motion is the

mechanism through which the Debtors seek the Court to determine the Debtors' enterprise value.

On May 26, 2006, the Court entered the Revised Order Establishing Dates Regarding Valuation

Hearing Related To The Debtors' Enterprise Value Pursuant To Bankruptcy Code Section 506(a)

[D.I. 383].  Among other things, this order scheduled an evidentiary hearing to determine the

enterprise value of the Debtors' businesses and outlined the scope and schedule of discovery,

including the submission of expert reports.   The order established that the sole issue for

consideration at the evidentiary hearing would be the enterprise value of the Debtors.

On September 6, 2006, the Court conducted a pre-trial conference.  On September 11,

2006, the Court entered the Order Regarding Valuation Trial, Exhibits, Confidentiality of

Documents and Testimony [D.I. 621].[2]  The evidentiary hearing on the enterprise value of the

Debtors took 26 days, beginning on September 13, 2006 and concluding on November 17, 2006.

The Debtors' expert witness, Mr. James Harris of Seneca Financial Group, Inc., took the

stand on September 27, 2006, and was tendered by the Debtors as an expert in the field of

enterprise valuation.  UBS and the Informal Committee objected to Mr. Harris's qualification as

---

[2]On September 20, 2006, the Court entered the Order Regarding Valuation Trial: Confidentiality
of Documents and Testimony [D.I. 661], which supplemented the previous procedural orders to
address issues relating to the submission of evidence designated as confidential.

an expert witness.   After extensive *voir dire* from UBS and the Informal Committee as well as

redirect by the Debtor, the Court heard oral argument on the objection to the qualifications of Mr.

Harris as an expert witness.

The Court denied the oral motion to exclude Mr. Harris's testimony.  The Court ruled

solely on the issue of whether Mr. Harris was qualified as an expert by knowledge, skill,

experience, training, or education, and found that he was.  The Court specifically reserved

judgment as to whether Mr. Harris's testimony was otherwise admissible under Rule 702 of the

Federal Rules of Evidence.

Mr. Harris completed his testimony on September 29, 2006.

On October 4, 2006, UBS and the Informal Committee filed the Joint Motion *in Limine*

of the Informal Committee of First Lien Lenders and UBS as Agent to the First and Second Lien

Lenders to Exclude the Expert Testimony and Reports of Debtors' Valuation Expert, James W.

Harris [D.I. 697] (the "Joint Motion *in Limine*").  The Official Committee joined in the Joint

Motion *in Limine* on October 6, 2006.

On October 9, 2006, the Debtors filed the Motion of the Debtors for an Order Admitting

Certain Trial Exhibits into Evidence [D.I. 711].  Through this motion, the Debtors sought to

admit into evidence, among other things, Debtors' Exhibits 1 - 4, which are:

1.    Mr. Harris's "Valuation Report of Nellson Nutraceutical, Inc." dated June 22,

2006.

2.    Mr. Harris's "Revision to Valuation Report Dated June 22, 2006 of Nellson

Nutraceutical, Inc." dated July 14, 2006.

3.    Mr. Harris's "Rebuttal Report to the Valuation Reports Prepared by Houlihan

Lokey Howard & Zukin, Chanin Capital LLC and FTI Consulting, Inc." dated July 14, 2006.[3]

4.      A one page document titled "James W. Harris Expert Witness History."

UBS, the Official Committee and the Informal Committee opposed the admission into evidence of Debtors' Exhibits 1 - 4 for the reasons set forth in the Joint Motion *in Limine*.  On October 20, 2006, the Court entered the Order Granting in Part and Denying in Part the Motion of the Debtors for an Order Admitting Certain Trial Exhibits into Evidence [D.I. 747].  In that Order, the Court denied without prejudice the motion to admit into evidence Debtors' Exhibits 1 - 4 and stated that the Court would consider the Debtors' motion in connection with the Joint Motion *in Limine*.

The Court heard oral argument on the Joint Motion *in Limine* on November 20, 2006.[4]

**Mr. Harris's Opinion**

Mr. Harris tendered an opinion to the Court as to the enterprise value of the Debtors. This opinion was presented in Mr. Harris's June 22nd valuation report and his July 14th revision to his valuation report.  In addition, Mr. Harris testified at length on September 27-29, 2006 as to his opinion of the Debtors' enterprise value.  Mr. Harris concluded that the enterprise value of

---

[3]A copy of Debtors' Exhibit 2 is appended to Debtors' Exhibit 3.  For purposes of this opinion, the exhibits are being treated as separate documents.

[4]At oral argument, UBS, the Official Committee and the Informal Committee withdrew their objection to the admission into evidence of Debtors' Exhibit 3 and any testimony related thereto. Thus, Debtors' Exhibit 3 is admitted into evidence.  In addition, Debtors' Exhibit 4 is admitted into evidence based upon the Court's previous ruling that Mr. Harris is qualified as an expert on enterprise valuation.

the Debtors, as of June 4, 2006, was $404.5 million.[5]

There are three valuation methodologies utilized under standard valuation practice.[6] Although the terms used to describe the methodologies vary, the methodologies themselves are standard. They are: (i) a discounted cash flow analysis or "DCF"; (ii) a precedent transaction or comparable transaction analysis; and (iii) a publicly traded company or comparable company analysis. At the heart of any valuation methodology is a simple task: the expert determines an appropriate metric of value and applies a multiple to that metric to determine the enterprise value of the company. Different methodologies use different sources of material to determine the appropriate metric of value and the multiple. For example, in basic terms, the metric of value under the DCF method is the company's future cash flows derived from its business plan and the multiple is the discount factor applied to those cash flows, which is derived from a combination of firm-specific and more general information. The expert analysis is required, among other things, to select the appropriate source material and to perform the actual calculation.

A DCF analysis derives the value of a company by calculating the company's future cash flows multiplied by a discount factor to determine a present value of those future cash flows. In performing the DCF analysis in this case, Mr. Harris (and the other experts) divided the Debtors' future cash flows (which were derived from the Debtors' long range business plan) into two

---

[5]At various times in analyzing the Debtors' enterprise value Mr. Harris provided a range of values but he relied on the median value in reaching his ultimate conclusion as to the Debtors' enterprise value.

[6]The Court's findings in this opinion regarding standard valuation practice are based on the testimony of all four experts in this case. Unless otherwise noted, the testimony concerning standard valuation practice was consistent among all four experts.

parts: (i)  the Debtors' "free cash flows" for 2006 - 2011; and (ii) the Debtors' terminal value as of the end of 2011.  Mr. Harris used the Debtors' projected 2011 EBITDA minus Cap Ex as the metric of value for determining the Debtors' terminal value.  Mr. Harris concluded that the net present value of the free cash flows for 2006 - 2011 is $89.7 million and the net present value of the Debtors' terminal value is $274.7 million for a concluded value of the Debtors under the DCF analysis of $364.4 million.

A precedent transaction or comparable transaction analysis derives the value of a company by examining recent control transactions of comparable companies.  In performing the precedent transaction analysis in this case, Mr. Harris analyzed five transactions that closed after January 1, 2004.  Based upon Mr. Harris's analysis of those transactions, he concluded that the Debtors' value under the precedent transaction or comparable transaction analysis is 9.8 times trailing 12 months EBITDA of $44.5 million or $435.3 million.

A publicly traded company or comparable company analysis derives the value of a company by examining the trading values of the equity of comparable publicly traded companies. In performing the comparable company analysis in this case, Mr. Harris analyzed the stock price over the last 10 years of publicly traded companies in three separate categories: (i) seven companies in the nutraceutical business; (ii) six companies in the food products sector that manufacture products for customers in a fashion similar to Nellson; and (iii) in excess of 100 "high performance" companies that are manufacturers with sales between $200 million and $1 billion, a ratio of EBITDA to net fixed assets of 70% or more and an EBITDA margin of 12% or more.  Based upon Mr. Harris's analysis of those transactions, he concluded that the Debtors' value under the publicly traded company or comparable company analysis is a multiple of trailing

12 months EBITDA minus Cap Ex of $36 million.  The multiple and, thus, the derived value varies in each category of comparable publicly traded companies is as follows:

| Category | Multiple | LTM EBITDA - Cap Ex | Value |
|---|---|---|---|
| High Performance | 11.9 | $36 million | $428.4 million |
| Contract Manufacturers | 11.7 | $36 million | $421.1 million |
| Nutraceutical | 9.4 | $36 million | $340.1 |

Under standard valuation practice, an expert will perform an analysis under each of the valuation methodologies discussed above and reach a conclusion by assigning an appropriate weight to each methodology.  For example, an expert might weigh each of the methodologies equally with his or her conclusion based 1/3 on the DCF analysis, 1/3 on the precedent transaction or comparable transaction analysis and 1/3 on the publicly traded company or comparable company analysis.  Finally, an expert may append the value of any non-operating assets or liabilities (i.e., not related to the company's enterprise or business but material assets or liabilities of the Company in any event) to reach the final conclusion of enterprise value.

In reaching his conclusion as to the Debtors' enterprise value in this case, Mr. Harris relied 100% on the DCF analysis and did not consider his precedent transaction analysis nor his publicly traded company analysis.[7]  Mr. Harris then added the Debtors' cash on hand, as of May 31, 2006, of $24.5 million and the present value of the goodwill amortization arising from the Debtors' purchase of the Canadian business of $15.6 million to his DCF value of $364.4 million to reach his ultimate conclusion of the Debtors' enterprise value of $404.5 million.

---

[7]Mr. Harris used his publicly traded company analysis as a minor part of his calculation of the discount factor used in his DCF analysis.

11

## Legal Standard for the Admissibility of Expert Testimony

Rule 702 of the Federal Rules of Evidence, made applicable to this contested matter by Rule 9017 of the Federal Rules of Bankruptcy Procedure, governs testimony by expert witnesses. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education,  may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Id*.

The Third Circuit has explained that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F. 3d 396, 404 (3d Cir 2003) (citing *In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 741-3 (3d Cir. 1994), *cert. denied*. 513 U.S. 1190 (1995); and *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 113 S. Ct. 2786; 125 L. Ed. 2d 469. (1993)).  The Debtors, as the proponents of the expert testimony, bear the burden of demonstrating by a preponderance of the evidence that the testimony is admissible.  *Daubert,* 509 U.S. at 592, n. 10.

The first requirement for the admission of expert testimony is that the witness must be a qualified expert.  This Court has already determined that Mr. Harris is qualified as an expert on enterprise valuation by his knowledge, skill, experience, training, and education.

On the second and third requirements for the admission of expert testimony, Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert,* 509 U.S. at 597.

**Reliability**

"In determining whether expert testimony is reliable, the Supreme Court has identified a number of factors which may be considered, including: (1) whether a theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Chartwell Litigation Trust v. Addus Healthcare, Inc., (In re Med Diversified Inc.)*, 334 B.R. 89, 95 (Bankr. E.D.N.Y. 2005) (*citing Daubert*, 509 U.S. at 593-94; and *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 1174; 143 L. Ed. 2d 238, 251 (1999)).

In *Kumho Tire*, the Supreme Court extended the *Daubert* standard to non-scientific testimony, requiring that, "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire*, 526 U.S. at 148 (internal citations omitted).

Under the Third Circuit's opinion in *United States v. Downing*, other factors should be considered along with the *Daubert* factors. *United States v. Downing,* 753 F.2d 1224, 1238-39 (3d Cir. 1985); *see Paoli*, 35 F.3d at 742 ("We now make clear that a district court should take into account all of the factors listed by either *Daubert* or *Downing* as well as any others that are relevant.") These factors are, "[1] the degree to which the expert testifying is qualified, [2] the relationship of a technique to 'more established modes of scientific analysis,' and [3] the 'non-judicial uses to which the scientific technique are put.'" *Paoli,* 35 F.3d at 742 *(citing Downing*,

13

753 F.2d at 1238-39).

The Third Circuit has "cautioned that the standard for determining reliability [of expert testimony] is not that high . . ." *In re TMI Litigation*, 193 F.3d 613, 665 (3d Cir. 1999), *amended on other grounds*, 199 F.3d 158 (2000), *cert. denied*, 530 U.S. 1225 (2000) (quoting *Paoli*, 35 F.3d at 745). Thus, the Debtors "do not have to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *TMI*, 193 F.3d at 665 (citation omitted). "In other words, the evidentiary requirement of reliability is lower than the merits standard of correctness." *Paoli*, 35 F.3d at 745.

Moreover, "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect." *TMI*, 193 F.3d at 665. "The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research. Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology." *Id.* (citation omitted).

**Relevance**

In addition to being reliable, expert testimony must also be relevant to be admissible. *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (Bankr. S.D.N.Y. 2003), *aff'd*, 99 F.App'x 274 (2d Cir. 2004). An expert opinion is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Thus, even if an expert utilizes a reliable methodology, the expert's application of that methodology must be relevant, *i.e.*, the methodology must be applied in a manner that will assist the trier of fact.

In this regard, if the factual basis of an expert's opinion is so fundamentally unsupported

14

because the expert fully relies on altered facts and speculation, or fails to consider relevant facts in reaching a conclusion, the expert's opinion can offer no assistance to the trier of fact, and is not admissible on relevance grounds. *See, e.g., Nebraska Plastics, Inc. v. Holland Colors Americas*, *Inc.,* 408 F.3d 410, 416-17 (8th Cir. 2005) (although factual basis of expert opinion generally goes to credibility, if opinion is "so fundamentally unsupported" in that it fails to consider relevant facts, than it can offer no assistance to the trier of fact and must be excluded); *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 807 (9th Cir. 1988) (expert study and future testimony properly excluded where it rested on speculation, unsupported assumptions, and ignored distinctions crucial to arriving at a valid conclusion); *Guillory v. Domtar Indus., Inc.,* 95 F.3d 1320, 1331 (5th Cir. 1996) (expert testimony properly excluded where it is not based upon facts in the record but on altered facts and speculation designed to bolster party's position).

### Application of the Legal Standard

**Mr. Harris's Use of EBITDA Minus Cap Ex to Determine the Debtors' Terminal Value Is So Unreliable as to Render His Opinion as to the Debtors' Enterprise Value Inadmissible.**

As discussed above, Mr. Harris tendered an opinion to the Court as to the enterprise value of the Debtors. In reaching that opinion, Mr. Harris relied primarily on his DCF analysis. In performing his DCF analysis, Mr. Harris divided the Debtors' future cash flows into two parts: (i) the Debtors' "free cash flows" for 2006 - 2011; and (ii) the Debtors' terminal value as of the end of 2011. Mr. Harris used the Debtors' projected EBITDA minus Cap Ex to determine the Debtors' terminal value. Mr. Harris's calculation of the Debtors' terminal value under his DCF analysis has a material impact on his ultimate conclusion as to the Debtors' enterprise value. Indeed, the terminal value of $274.7 million used under Mr. Harris's DCF analysis accounts for

15

approximately 68% of Mr. Harris's concluded enterprise value of the Debtors of $404.5 million.

It is Mr. Harris's use of EBITDA minus Cap Ex to determine the Debtors' terminal value that is the basis for the movants' motion. The movants argue that Mr. Harris's unprecedented and "maverick" use of EBITDA minus Cap Ex to determine the Debtors' terminal value is so unreliable as to render his opinion as to enterprise value inadmissible. They are correct.

There are numerous problems with Mr. Harris's methodology that make it unreliable under the *Daubert/Downing* standards. The overarching problem, however, is that the use of EBITDA minus Cap Ex to determine a company's terminal value under a DCF analysis is unprecedented both in the legal context and in the relevant scientific community.

Mr. Harris and the other experts testified that, while EBITDA minus Cap Ex is used as a "credit statistic" to measure, among other things, whether a company can adequately service its debt, it has never been used by any expert before any court in the United States to determine a company's terminal value under a DCF analysis. Indeed, Mr. Harris testified that he has never used this methodology in any expert report that he has ever submitted to a court and his own comprehensive, 85-page training manual does not mention EBITDA minus Cap Ex as an available metric for determining terminal value under a DCF analysis. Mr. Harris was also unable to identify any publications, treatises or articles that validate the use of EBITDA minus Cap Ex to determine terminal value under a DCF analysis.[8] In short, the evidence clearly

---

[8]During Mr. Harris's direct examination, the Debtors attempted to introduce into evidence certain articles that discuss the use of EBITDA minus Cap Ex in an entirely different context other than as a valuation tool. The Court sustained numerous objections to the admission of the articles as hearsay under Fed. R. Evid. 802. The Court ruled that the articles were not subject to the hearsay exception under Fed. R. Evid. 803(18) because Mr. Harris testified that he had not read the articles and did not rely on them in performing his analysis. Indeed, the evidence indicates that the articles were discovered by the Debtors' counsel after Mr. Harris submitted his expert reports.

indicates that Mr. Harris simply invented the methodology of using EBITDA minus Cap Ex to determine a company's terminal value under a DCF analysis.[9]  Reliance on an invented methodology that has not been generally accepted by experts in the field, standing alone, is sufficient to exclude Mr. Harris's expert opinion. *See*, *e.g.*, *Lippe*, 288 B.R. at 690.

Notwithstanding the foregoing, *Daubert* and its progeny require the Court to weigh several factors in determining whether expert testimony is sufficiently reliable to be admissible. In weighing those factors, the Court must be mindful that "the evidentiary requirement of reliability is lower than the merits standard of correctness." *TMI*, 193 F.3d at 665.  Even at the lower standard of reliability, however, application of the *Daubert/Downing* factors weighs in favor of excluding Mr. Harris's testimony.

*Whether a Theory or Technique Can Be, and Has Been, Tested*

Any valuation methodology, including use of EBITBA minus Cap Ex to determine the terminal value in a DCF analysis, can be tested by reference to the market.  Nonetheless, because no other experts in the valuation field rely on EBITBA minus Cap Ex to determine value, the method has not been tested.  Thus, this factor weighs in favor of excluding Mr. Harris's testimony.

---

The Debtors once again sought to put the articles before the Court in the Debtors' brief in opposition to the Joint Motion *in Limine*.  As the articles remain inadmissible hearsay, the Court has not considered them in determining whether Mr. Harris's expert testimony is inadmissible. In any event, if the articles were admitted into evidence they would not validate the use of EBITDA minus Cap Ex to determine terminal value under a DCF analysis.

[9]The testimony of the other three experts in this case also support the finding that Mr. Harris's methodology is not generally accepted in the valuation field.

*Whether the Theory or Technique Has Been Subjected to Peer Review and Publication*

Mr. Harris's methodology has not been subject to peer review, nor have there been any publications using this method that Mr. Harris considered in forming his opinion. This factor weighs in favor of excluding Mr. Harris's testimony.

*A Technique's Known or Potential Rate of Error and the Existence and Maintenance of Standards Controlling the Techniques Operation*

As Mr. Harris's methodology has not been tested, has not been subjected to peer review, is not generally accepted in the field and has never been used or relied upon in a court of law, there is no way to know whether the methodology leads to erroneous results and there are no established standards controlling its application. Indeed, Mr. Harris testified that he would use EBITDA minus Cap Ex in an "appropriate case" but he was unable to identify a single factor that he would deem relevant to determine whether to use his invented methodology. This factor weighs in favor of excluding Mr. Harris's testimony.

*Whether a Particular Technique or Theory Has Gained General Acceptance in the Relevant Scientific Community*

Mr. Harris's own testimony as well as the testimony of the other experts in this case support a finding that Mr. Harris's methodology has not gained general acceptance in the relevant scientific community: (i) it has never been used by any expert before any court in the United States to determine a company's terminal value under a DCF analysis; (ii) Mr. Harris has never used it to determine a company's terminal value under a DCF analysis; (iii) Mr. Harris's own comprehensive, 85-page training manual does not mention EBITDA minus Cap Ex as an available metric for determining terminal value under a DCF analysis; and (iv) Mr. Harris could

18

not identify any publications, treatises or articles that validate the use of EBITDA minus Cap Ex

to determine terminal value under a DCF analysis.  This factor weighs in favor of excluding Mr.

Harris's testimony.

*The Degree to Which the Expert Testifying Is Qualified*

This Court has already determined that Mr. Harris is qualified as an expert on enterprise

valuation by his knowledge, skill, experience, training, and education.  This factor weighs in

favoring of admitting Mr. Harris's testimony.

*The Relationship of a Technique to More Established Modes of Scientific Analysis*

The use of EBITDA minus Cap Ex to determine terminal value under a DCF analysis is

related to the use of EBIT or EBITDA to determine such value, which all the experts agree is a

generally accepted methodology.  Mr. Harris testified that his terminal value relies entirely on the

Debtors' estimate of capital expenditures for 2011 - - the final year of the Debtors' long range

business plan.  Mr. Harris further testified that the Debtors' capital expenditures are highly

volatile from year-to-year, they have varied drastically in the past, and they will continue to do so

in the future.  All the experts agree that, while EBITDA and EBIT also vary from year-to-year,

they are less volatile than a company's capital expenditures.  Indeed, depreciation and

amortization generally reflect a company's history of capital expenditures normalized over time.

Thus, a more stable and less volatile method of determining terminal value that reflects a

company's capital expenditures would be to use EBIT - - a methodology that all the experts agree

is generally accepted in the valuation community.

Because Mr. Harris's methodology relies so heavily on a company's projections of capital

expenditures, which are more volatile than a company's projections of EBIT and EBITDA, it is a

less reliable metric of value than EBIT or EBITDA.  Thus, while Mr. Harris's methodology is related to generally accepted techniques, it is inherently less reliable.  This factor weighs in favor of excluding Mr. Harris's testimony.[10]

*The Non-Judicial Uses to Which the Scientific Technique Are Put*

The evidence establishes that the first and only time a valuation expert has used EBITDA minus Cap Ex to determine terminal value under a DCF analysis is Mr. Harris in this trial. Without any non-judicial uses for this methodology, this factor weighs in favor excluding Mr. Harris's testimony.

The purpose of applying the *Daubert/Downing* factors is to "determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire*, 526 U.S. at 148.   Application of the factors in this case leads to the inescapable conclusion that Mr. Harris's use of EBITDA minus Cap Ex to determine terminal value under a DCF analysis is not reliable and, thus, must be excluded.  Because Mr. Harris's conclusion of terminal value constitutes approximately 68% of his ultimate conclusion as to the Debtors' enterprise value and is, in fact, inseparable from his ultimate conclusion, the entirety of Mr. Harris's testimony as to the Debtors' enterprise value must be excluded as unreliable under Rule 702 of the Federal Rules of Evidence.[11]

---

[10]The issue is not with Mr. Harris's actual performance of the DCF calculation but with the metric of value that Mr. Harris inserted into the calculation, *i.e.*, EBITDA minus Cap Ex.

[11]The movants argue that Mr. Harris's use of the "high performance" companies in performing his publicly traded company or comparable company analysis is unreliable and, thus, renders his opinion inadmissible.  The Court finds that Mr. Harris's publicly traded company or comparable company analysis is immaterial to Mr. Harris's opinion of the Debtors' enterprise value.  Thus, the movants' motion to exclude Mr. Harris's testimony on the basis of the use of the "high

**There Is Insufficient Evidence Before the Court to Render Mr. Harris's Opinion Inadmissible on Grounds of Relevancy**

In addition to being reliable, expert testimony must also be relevant to be admissible. *Lippe*, 288 B.R. at 687.  If the factual basis of an expert's opinion is so fundamentally unsupported because the expert fully relies on altered facts and speculation, or fails to consider relevant facts in reaching a conclusion, the expert's opinion can offer no assistance to the trier of fact, and is not admissible on relevance grounds.

In this case, the movants contend that the Debtors' long range business plan was manipulated by the Debtors' management in anticipation of this trial to bolster the Debtors' enterprise value.  The movants argue that Mr. Harris's testimony is irrelevant because it relies in its entirety on the Debtors' long range business plan, which Mr. Harris knew or had reason to know was unreliable.

There is evidence in the record supporting the movants' argument that certain portions of the Debtors' long range business plan were manipulated by the Debtors' management in anticipation of this trial to bolster the Debtors' enterprise value.  The record does not support a finding, however, that Mr. Harris knew or had reason to know the Debtors' long range business was unreliable.

The movants further argue that, even if Mr. Harris had no reason to know the Debtors' long range business plan had been manipulated, he should have performed further due diligence because his conclusion was based primarily on a DCF analysis, which, in turn, was based entirely on the Debtors' projections.  The movants argument fails for at least two reasons.  First, an

performance" companies is denied.

21

expert's reliance on management's business plan in performing a valuation of a company is certainly reasonable. Indeed, each of the experts in this case relied on management's business plan in performing their DCF analysis.[12] Second, each of the experts testified that, under standard valuation practice, an expert will perform an analysis under each of the valuation methodologies and reach a conclusion by assigning an appropriate weight to each methodology. There is no evidence in the record supporting the movants' argument that when an expert determines to assign a weight of 100% to a certain methodology (in this case the DCF analysis) the expert is then required to perform additional due diligence into the facts underpinning that methodology.

Thus, while there is evidence in the record supporting the movants' argument that certain portions of the Debtors' long range business plan were manipulated by the Debtors' management, that evidence is insufficient to render Mr. Harris's testimony inadmissible on grounds of relevancy.

## Conclusion

In this case, two of the three criteria for the admissibility of expert testimony are met: qualification and relevancy. Mr. Harris's use of EBITDA minus Cap Ex to determine terminal value under a DCF analysis, however, is not reliable and, thus, must be excluded. Because Mr. Harris's conclusion of terminal value constitutes the bulk of his ultimate conclusion as to the Debtors' enterprise value and is, in fact, inseparable from his ultimate conclusion, the entirety of Mr. Harris's testimony as to the Debtors' enterprise value must be excluded as unreliable under

---

[12]Certain experts made adjustments in their DCF analysis to reflect what they considered as unrealistic assumptions or projections in the Debtors' long range business plan.

22

Rule 702 of the Federal Rules of Evidence.