IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | Case No. 06-10072(CSS) |
| NELLSON NUTRACEUTICAL, INC., | ) | |
| et al., | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Related Docket No. 1222 |

**OPINION**[1]

| | |
|---|---|
| Laura Davis Jones | Kurt F. Gwynne |
| Curtis A. Hehn | Thomas J. Francella, Jr. |
| Michael Seidl | Reed Smith, LLP |
| Pachulski Stang Ziehl | 201 Market Street |
| Young Jones & Weintraub | 15th Floor |
| 919 N. Market Street | Wilmington, DE  19801 |
| 16th Floor | |
| Wilmington, DE  19801 | Claudia Springer |
| | Reed Smith, LLP |
| Brad R. Godshall | 2500 One Liberty Place |
| Alan J. Kornfeld | 650 Market Street |
| Pachulski Stang Ziehl | Philadelphia, PA  19103 |
| Young Jones & Weintraub | |
| 10100 Santa Monica Blvd. | Counsel for the Official |
| Suite 1100 | Committee of Unsecured |
| Los Angeles, CA  90067 | Creditors |
| | |
| Counsel for Debtors and | Richard W. Riley |
| Debtors in Possession | Duane Morris, LLP |
| | 1100 North Market Street |
| Robert S. Brady | Suite 1200 |
| M. Blake Cleary | Wilmington, DE 19801 |
| Margaret B. Whiteman | |
| Young Conaway Stargatt | James J. Holman |
| & Taylor, LLP | Duane Morris, LLP |
| P.O. Box 391 | 30 South 17th Street |
| Wilmington, DE  19899-0391 | Philadelphia, PA  19103 |

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

Fred S. Hodara
Abid Qureshi
Akin, Gump, Strauss, Hauer
& Feld
590 Madison Avenue
New York, NY 10022

Scott L. Alberino
Akin, Gump, Strauss, Hauer
& Feld
1333 New Hampshire Ave., N.W.
Washington, D.C. 20036


Counsel for the Informal
Committee of First Lien Lenders

Linda Dakin-Grim
Gregory A. Bray
Thomas R. Kreller
Jason B. Baim
Milbank, Tweed, Hadley
& McCoy
601 S. Figueroa St.
30th Floor
Los Angeles, CA  90017

Counsel for UBS AG,
Stamford Branch

William K. Harrington
Trial Attorney
Office of the United
States Trustee
Lockbox 35
Wilmington, DE  19801

Counsel for Kelly
Beaudin Stapleton, the
United States Trustee
for Region 3

Date: May 24, 2007

SONTCHI, J.


## Introduction

Before the Court is the Debtors' Precautionary Motion
For Order Approving Modification To Ordinary Course Bonus
Compensation Program For Employees [Docket No. 1222].
Through the motion, the Debtors seek the Court's approval
to modify the Debtors' "ordinary course employee bonus
compensation program" for the calendar year 2006 (the "2006
OCP").[2]   The Debtors' motion raises a number of issues

---

[2] The Debtors did not seek Court approval when they established the 2006
OCP in April, 2006.

relating to the interplay between section 363(c)(1) of the Bankruptcy Code, which provides that "the [Debtors] may enter into transactions . . . and may use property of the estate in the ordinary course of business without notice and a hearing," and section 503(c) of the Bankruptcy Code, which severely limits the Debtors' ability to pay retention bonuses, severance, and other amounts.  More specifically, the motion concerns the scope of the Court's inquiry in determining whether to approve the Debtors' use of property in the ordinary course of business to make payments governed by section 503(c) of the Bankruptcy Code.  Is the Court's inquiry limited to whether the Debtors are making payments in the ordinary course of business and application of the standard governing such transactions or does section 503(c) of the Bankruptcy Code impose additional criteria (and, if so, what criteria) that must be satisfied before such payments can be approved by the Court?

In evaluating the motion, the Court must address the following questions: (i) is the Debtors' proposed modification to the 2006 OCP a transaction or use of property that is "in the ordinary course of business" under 363(c)(1) of the Bankruptcy Code and, if so, have the Debtors satisfied the standard governing such transactions; (ii) is section 503(c)(1) of the Bankruptcy Code, which

limits retention payments to insiders, applicable to an otherwise valid transfer made in the ordinary course of business to "an insider of the debtor for the purpose of inducing such person to remain with the debtor's business;" (iii) assuming section 503(c)(1) is applicable, is the modification of the 2006 OCP a transfer to "an insider of the debtor for the purpose of inducing such person to remain with the debtor's business;" and (iv) is section 503(c)(3) of the Bankruptcy Code, which limits "other transfers . . . that are outside the ordinary course of business," including payments to officers, managers or consultants, applicable to an otherwise valid transfer made in the ordinary course of business, notwithstanding the limitation on the face of the statute to the contrary.

Applying the horizontal and vertical dimensions test articulated by the Third Circuit, the Court finds that the modification of 2006 OCP is within the ordinary course of the Debtors' business under 363(c)(1) of the Bankruptcy Code. The Court further finds that the Debtors have satisfied the standard governing transactions in the ordinary course of business.

The Court also finds that section 503(c)(1) is applicable to an otherwise valid "transfer made in the ordinary course of business to an insider of the debtor for

the purpose of inducing such person to remain with the debtor's business." Nonetheless, the Court finds that the modification of the 2006 OCP is not such a transfer.

Finally, the Court finds that section 503(c)(3) is specifically limited to transactions outside of the ordinary course of business and, thus, is not applicable to the modification of the 2006 OCP.

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)(B), (M) and (O).

## Statement of Facts

### General Background

On January 28, 2006, Nellson Nutraceutical, Inc. and certain of its affiliates (collectively, the Debtors) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors are contract manufacturers of nutritional bars and powders. As such, the Debtors do not manufacture or sell products under their own label. Rather, the

Debtors develop and produce products for sale by their customers.

**2006 Employee Incentive Programs**

In January, 2006, prior to the filing of these Chapter 11 cases, the Debtors implemented a key employee retention plan (the "KERP") that provided for payment to nine management employees (all of which are "insiders" under section 101(31) of the Bankruptcy Code) in the aggregate amount of $710,000 upon the occurrence of the earlier of a termination of employment without cause or a "capital event" involving a sale of the Debtors' business or a restructuring of its capital structure.

Almost immediately after the filing of these Chapter 11 cases, in April, 2006, the Debtors implemented two separate incentive plans for certain of its employees. The first such plan was a management incentive plan ("MIP"), which replaced the KERP. Under the MIP, the Debtors established a bonus pool of approximately $1.4 million to provide incentive to the same nine management employees (and insiders) covered under the KERP to assist the Debtors in the effort to restructure the Debtors' business. Unlike the original KERP, payment of the bonuses under the MIP was to be earned by the achievement of certain EBITDA targets

for 2006, which were described as "performance milestones."[3] After conducting a two-day trial on the matter, the Court entered an order in July, 2006, approving the MIP. Ultimately, the Debtors paid bonuses totaling approximately $550,000 under the MIP as the Debtors did not achieve all of the performance milestones.  No further payments under the KERP or the MIP are due to any of the Debtors' employees.

In April 2006, the Debtors also implemented the 2006 OCP.  The 2006 OCP is an employee incentive plan covering approximately 130-140 employees divided into six categories.  Under the 2006 OCP, the Debtors established a bonus pool of approximately $2.1 million to motivate employees to "keep[] momentum going forward . . . in both sales and EBITDA." Hr'g. Tr. 40, Apr. 23, 2007. *But see* Debtors Ex. 2 ("For 2006, the purpose is to build EBITDA.").  The categories under the 2006 OCP and their respective share of the bonus pool are set forth below:

---

[3]  "EBITDA" means earnings before interest, taxes, depreciation and amortization.

| Category | Description of Covered Employees | Approximate Number of Covered Employees | Bonus Pool ('000) |
|---|---|---|---|
| **Level I** | Management level officers, including the Chief Executive Officer, Chief Financial Officer and various vice presidents of the Debtors | 8 | $1,037 |
| **Level II** | Operational directors[4] of the Debtors, including Director of Purchasing, Director of Manufacturing and Director of Finance | 14 | $490 |
| **Level III** | Managers, including R&D Managers, Materials Managers and Maintenance Managers | 32 | $469 |
| **Sales Directors** | Director level employees in charge of sales to customers | 3 | $27 |
| **Sales Managers** | Manager level employees in charge of sales to customers | 5 | $16 |
| **Line Managers/ Office Staff** | Employees responsible for managing the day-to-day tasks of the Debtors | 71 | $87.6 |
| **Total** | | **131** | **$2,126.6** |

For Level I, Level II and Level III employees, payment of

the bonuses under the 2006 OCP was "totally based on

---

[4] The Debtors' use of "director" in describing certain of its employees does not mean that these employees are members of the board of directors. In fact, the only employee that is also a member of the board of directors is the Debtors' Chief Executive Officer, Mr. Dias. Hr'g Tr. 45-50.

achievement of the Consolidated Budgeted EBITDA level" for 2006, which was $43.2 million. Debtors Ex. 2.  For the remaining employees, payment of the bonuses was based on other criteria, such as sales, earnings or hours worked. *Id.*[5]

Under the 2006 OCP, the Level I, II and III employees would receive a bonus calculated as a percentage of base salary in the event the Debtors achieved their target EBITDA of $43.2 million for 2006.  This "target bonus" was 50% of base salary for Level I employees; 30% of base salary for Level II employees; and 20% of base salary for Level III employees.[6]  In the event the Debtors did not achieve their target EBITDA of $43.2 million but achieved at least 93% of their target, *i.e.*, EBITDA of $40.2 million, the Level I, II and III employees would still receive a bonus at 50% of the target level.  Thus, under the 2006 OCP, if the Debtors achieved EDITDA in the range of $40.2 – $43.2 million, the Debtors would pay bonuses of 25% of base salary for Level I employees;[7] 15% of base

---

[5] At the conclusion of the hearing on the motion, the UST withdrew her objection to the 2006 OCP as it pertains to Sales Directors, Sales Managers and Line Managers/Office Staff and the Court entered an order approving bonuses for those employees.  Thus, the Court will focus its recitation of the facts to those applicable to the Level I, II and III employees.

[6] The "target bonus" for the Debtors' Chief Executive Officer was 60% of base salary.

[7] 30% for the Debtors' Chief Executive Officer.

salary for Level II employees; and 10% of base salary for Level III employees.[8]

The Debtors' Chief Executive Officer, Mr. Jeffrey Dias, testified that the target EBITDA of $43.2 million established in March 2006 was a "stretch" and did not take into account the possible negative effects to the Debtors' business that might result from the Debtors' bankruptcy. Nonetheless, Mr. Dias testified that the Debtors set a target of $43.2 million of EBITDA because: (i) it exceeded the Debtors' results for the last 12 months as of March 2006, which had been trending positively in late 2005 and early 2006; (ii) the initial reaction of the Debtors' customers, employees and suppliers to the bankruptcy had been favorable; (iii) there was no reason to believe the Debtors' performance would decline; and (iv) it would not successfully motivate the employees to establish a bonus program contingent upon the Debtors performing more poorly than the most recent operating results.

Ultimately, the Debtors did not achieve their target EBITDA for 2006. In fact, the Debtors' EBITDA for 2006 was $37.1 million or 86% of the target EBITDA of $43.2 million.

---

[8] The Debtors' Chief Executive Officer testified that he was authorized to pay bonuses under the 2006 OCP if the Debtors achieved 90% of target EBITDA. Nonetheless, the documentation implementing the 2006 OCP established 93% of target EBITDA as the minimum threshold for payment of bonuses.

Thus, under the terms of the 2006 OCP as implemented in April, 2006, no bonuses are due to the Level I, II or III employees.[9]

**2007 Modification of the 2006 OCP Program**

Notwithstanding that the Debtors did not achieve their target EBITDA for 2006, in January 2007, the Debtors modified the 2006 OCP to authorize paying bonuses to all of the employees covered under the program.  Under the modified 2006 OCP (as adopted in January 2007), the Level I, II and III employees would receive bonuses in *excess* of those payable under the original 2006 OCP had the Debtors achieved EDITDA in the range of $40.2 - $43.2 million.  In order to mollify the Debtors' primary creditor constituencies, the Debtors subsequently reduced the bonuses payable to the Level I employees (including the Chief Executive Officer) to an amount slightly below that which would have been payable had the Debtors achieved 93% of the target EBITDA.  The specific bonuses payable under the modified 2006 OCP to Level I, II and III employees (after the reduction described above) are as follows:

---

[9] In addition, under the terms of the 2006 OCP as implemented in April, 2006, no bonuses are due to the Sales Directors, Sales Managers or Office Staff.  It is unclear from the record whether any bonuses are due to the Line Managers.

| Category | Original Bonus at 100% Target EBITDA (% Base Salary) | Original Bonus at 93% EBITDA (% Base Salary) | Modified Bonus at 87% EBITDA (% Base Salary) | Modified Bonus Pool at 87% EBITDA ('000) |
|---|---|---|---|---|
| Level I | 50%[10] | 25%[11] | 23.5% | $487.7 |
| Level II | 30% | 15% | 22.5% | $355.7 |
| Level III | 20% | 10% | 15% | $350.6 |
| Total | | | | $1,194.0 |

In addition, under the modified 2006 OCP, the Sales Directors would receive bonuses at 98% of the level that would have been due had the Debtors achieved their target. The Sales Managers, Line Managers and Office Staff would receive bonuses under the modified 2006 OCP at 100% of the level that would have been due had the Debtors achieved their target. The total bonus pool under the modified 2006 OCP for the employees below Level III is $130,000 compared to approximately $1.2 million in the aggregate for Level I, II and III employees.

Mr. Dias testified that, notwithstanding the failure to achieve the lowest threshold for payment of bonuses under the original plan, the payment of bonuses under the modified 2006 OCP is justified because the Debtors' failure

---

[10] 60% for the Debtors' Chief Executive Officer.

[11] 30% for the Debtors' Chief Executive Officer.

to achieve those targets was not a result of any failure by
the employees.

> The Board looked back across the year, said now we
> can understand at least some of the impact of
> bankruptcy and other effects on the business which
> were not the responsibility of either the
> management or the employees, and they decided that
> . . . should not be a basis for denying people
> compensation when the things they could influence,
> they had done, frankly a great job on.

Hr'g Tr. 62.

Rather, Mr. Dias testified that the failure to achieve
the EBITDA target was primarily the result of (i) a
reduction in new business from existing customers related
directly to the ongoing bankruptcy; and (ii) currency
fluctuations that adversely affected the earnings of the
Debtors' Canadian operations.    Thus, Mr. Dias testified
that it made "good business sense" to modify the 2006 OCP
to allow for payment of bonuses.

> The EBITDA target was set in an environment where
> we had no idea of the impact of [bankruptcy], and
> we said so.  We told our employees – I told them
> that I didn't want them to have in their mind
> thinking about any impact of [bankruptcy].    I
> wanted them to perform as though this was better
> than a normal year for the company.  The numerical
> analysis when you do a look back shows that if you
> add back the amount of money that was due to the
> hit on sales from bankruptcy, and you make an
> adjustment for the currency effect, even by the
> very original rules of the plan that I presented to
> the Board, a 70 percent payment of target would
> have been justified.

Hr'g Tr. 66 – 67.

**Pre-2006 Employee Incentive Programs**

The Debtors had previously adopted employee incentive programs for 2003, 2004 and 2005 that were substantially similar to the 2006 OCP. In each of those years, the Debtors established an EBITDA target, divided the employees into different categories, and established a bonus as a percentage of base salary based upon achieving the EBITDA target (with an increased bonus if the employees outperformed the objective and a reduced bonus if the employees underperformed the objective).

In addition, in each of those years the Debtors made *ex-post* adjustments to the employee incentive program. Mr. Dias testified that:

> two things typically happen every year. One is, you design a program for that year that addresses the unique circumstances of the year, and then you also look back across the year, and the Board always reserves the right to make changes in a plan based on what it sees as operationally significant for the year.

Hr'g Tr. 42.

Thus, in early 2004, the Debtors decided to make bonus payments under the 2003 employee incentive program even though the Debtors failed to achieve the target for 2003. Those payments were at 30% to 50% of what would have been payable had the Debtors achieved the target for 2003.

Similarly, in early 2005, the Debtors decided to make bonus payments to certain employees under the 2004 employee incentive program even though the Debtors failed by a wide margin to achieve the target for 2004.  In this instance, the Debtors did not grant bonuses to senior management but did make payments to junior managers and other employees.

Finally, in early 2006, the Debtors decided to make bonus payments under the 2005 employee incentive program even though the Debtors failed to achieve the target for 2005.  The Debtors made bonus payments at 66% of what would have been payable had the Debtors achieved the 2005 target.

**The Motion and the Hearing**

The Debtors did not seek Court approval when the 2006 OCP was established in April 2006.  In July 2006, during the trial on approval of the MIP, the Debtors' counsel represented to the Court that the Debtors would seek Court approval prior to making any payments to employees under the 2006 OCP in the event the performance milestones under the 2006 OCP were not met.

In March 2007, after negotiations with the UST, the Official Committee of Unsecured Creditors (the "Committee"), UBS AG, Stamford Branch, the agent for the First Lien Lenders and the Second Lien Lenders ("UBS"), and the Informal Committee of First Lien Lenders (the "Informal

Committee"), the Debtors filed the motion.  On April 23, 2007, the Court conducted a hearing on the motion.

At the hearing, the Debtors' Chief Executive Officer, Mr. Dias, testified in favor of the motion.  In addition, the Debtors offered the testimony of a compensation expert.[12]  The Debtors' expert, Jeff Visithpanich, offered the following opinions[13] at the hearing:

> i)    it is common for companies comparable to the Debtors to have bonus programs similar to the 2006 OCP;
>
> ii)   it is common for companies comparable to the Debtors to modify bonus programs in a manner similar to the Debtors' modification of the 2006 OCP;
>
> iii)  the 2006 OCP as modified is reasonable because the total compensation (including base salary and all bonuses) to be paid to the Debtors' Level I and II employees is within market norms for companies comparable to the Debtors; and
>
> iv)   the payment of bonuses to the Level I, II and III employees under the 2006 OCP as modified is consistent with the Debtors' payment of bonuses in 2003, 2004 and 2005.

The UST opposed the motion, cross-examined each of the witnesses and submitted a number of exhibits into evidence in opposition to the motion.

---

[12] The Debtors also submitted numerous exhibits into evidence in support of the motion.

[13] Mr. Visithpanich was qualified under Rule 702 of the Federal Rules of Evidence (without objection) as an expert in compensation.

Counsel for the Committee stated at the hearing that, based upon the agreed reduction of the bonus payable to the Level I employees and the clarification that no further payments were due to any employees under the MIP or the KERP, the Committee did not object to the motion.    In addition, counsel for UBS and the Informal Committee both expressed support for the motion.    Thus, the motion has the tacit or active support of the parties with an economic stake in the outcome of these Chapter 11 cases.

## Legal Analysis

**The Debtors' modification of the 2006 OCP is "in the ordinary course of business" under 363(c)(1) of the Bankruptcy Code and the Debtors have satisfied the standard governing such transactions.**

Under sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors (as debtors in possession) are authorized to operate their business.    11 U.S.C. §§ 1107(a) and 1108. Section 363(c)(1) of the Bankruptcy Code provides that, unless the Court orders otherwise, a debtor in possession may enter into transactions, including the use, sale or lease of estate property in the ordinary course of business, without notice and a hearing. 11 U.S.C. § 363(c)(1). In contrast, section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "*after notice and a hearing*, may use, sell, or lease, other than in the

ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1) (emphasis added).[14]  Thus, whether notice and a hearing are required depends on whether a transaction is "in the ordinary course of business."

The distinction between transactions in the ordinary course of business and those outside the ordinary course of business, however, goes beyond the procedural requirements of notice and a hearing.  "The framework of section 363 is designed to allow a trustee (or debtor in possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *In re Roth American, Inc.,* 975 F.2d 949, 952 (3d Cir. 1992).

Indeed, "the discretion [for a debtor in possession] to act with regard to *ordinary* business matters without prior court approval has been said to be 'at the heart' of the powers of a . . . debtor in possession, and courts have shown a reluctance to interfere, in the making of routine, day-to-day business decisions." 7 COLLIER ON BANKRUPTCY ¶ 1108.07 (Alan N. Resnick and Henry J. Sommer eds. 15th ed. 2006) (emphasis in original).  As such, if the Court

---

[14] Absent notice and a hearing, a transaction outside the ordinary course of business is avoidable. 11 U.S.C. § 549(a)(2)(B).

determines that a transaction is in the ordinary course of a debtor's business, the Court will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code. *In re Curlew Valley Associates*, 14 B.R. 506, 513 (Bankr. D. Utah 1981).  Put another way, the Court will not disturb a transaction within the ordinary course of business if "the trustee can articulate reasons for his conduct (as distinct from a decision made arbitrarily or capriciously)" *Id.* at 513 n.11a.

Although the determination of whether a transaction is in the ordinary course of business can have broad implications, "[n]either the Bankruptcy Code nor its legislative history provides a framework for analyzing whether particular transactions are in the ordinary course of a debtor's business." *Roth American,* 975 F.2d at 952. In order to determine whether or not a transaction falls in the ordinary course of business most courts, including the Third Circuit, have adopted a two-step inquiry.  *Id.*  This inquiry consists of looking at the transaction from horizontal and vertical dimensions.  *Id.*  The test for the horizontal dimension "is whether, from an industry-wide

perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Id.* at 953.

The vertical dimension, which is also known as the creditor's expectation test, "analyzes the transactions from the vantage point of a hypothetical creditor and the inquiry is whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit." *Id.* (quotations omitted). Under the vertical test, "the touchstone of ordinariness is the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of business." *Id.* Thus, a debtor's pre-petition business practices and conduct is the primary focus of the vertical analysis. *Id.* The Court must "also consider the changing circumstances inherent in the hypothetical creditor's expectations." *Id.* (citations omitted.)

In this case, the Debtors' modification of the 2006 OCP satisfies both the horizontal and vertical dimensions tests and, thus, is within the ordinary course of the Debtors' business. First, with regard to the horizontal dimension test, Mr. Visithpanich's testified that not only is it common for companies comparable to the Debtors to have bonus programs similar to the 2006 OCP, it is also

common for those comparable companies to modify bonus programs in a manner similar to the Debtors' modification of the 2006 OCP.

Specifically, Mr. Visithpanich identified 20 companies that he opined were comparable, based upon revenue, EBITDA and products, to the Debtors. Mr. Visithpanich "then analyzed, based upon publicly available documents, what [the comparable companies'] bonus plans look like and from analyzing those bonus plans, [determined] that the measures there are very similar to what we have at [the Debtors]." H'rg Tr. 137. Mr. Visithpanich testified that 12 of the 20 comparable companies have bonus programs containing measures very similar to those applicable to the Level I, II, and III employees as well as the sale professionals.

Mr. Visithpanich further testified that 10 of those 20 companies had language in their bonus plans allowing for *ex post* adjustments and 6 of those 20 companies actually made *ex post* adjustments to their bonus plans similar to the modification of the 2006 OCP by the Debtors. Moreover, Mr. Visithpanich testified that, because he relied upon publicly available data, the frequency of *ex post* adjustments may be even higher than he observed in that many of those cases where the comparable companies were not identified as having similar programs or making similar *ex*

*post* adjustments there was insufficient information available to determine whether the company's bonus program was similar to the Debtors' program. Thus, Mr. Visithpanich's testimony established that the horizontal dimension test is satisfied because "from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Roth American*, 975 F.2d at 953.

Second, with regard to the vertical dimension test, Mr. Dias testified that the Debtors' modification of the 2006 OCP is consistent with the Debtors' pre-petition business practices. Specifically, Mr. Dias testified that the Debtors had previously adopted employee incentive programs for 2003, 2004 and 2005 that were substantially similar to the 2006 OCP. Each of those bonus programs established an EBITDA target, divided the employees into different categories, and established a bonus as a percentage of base salary based upon achieving the EBITDA target. Moreover, in each of those years, the Debtors awarded bonuses to some or all of the covered employees at reduced levels, notwithstanding that in each year the Debtors failed to achieve the target for that year. Finally, Mr. Visithpanich opined that the payment of bonuses to the Level I, II and III employees under the 2006

OCP as modified is consistent with the Debtors' payment of bonuses in 2003, 2004 and 2005.

Thus, the testimony of Mr. Dias and Mr. Visithpanich established that the Debtors' modification of the 2006 OCP was consistent with the Debtors' pre-petition business practices – at least for the somewhat limited period of 2003-2005.  As a result, the modification of the 2006 OCP is consistent with "the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of business" and, thus, the vertical dimension test is satisfied. *Id*.

The finding that the Debtors' modification of the 2006 OCP is in the ordinary course of the debtors' business is consistent with the holdings of two recent cases where bankruptcy courts have determined that an incentive plan established post-petition by a debtor-in-possession for the benefit of senior management is in the ordinary course of the debtor's business.  *See In re Dana Corp.,* 358 B.R. 567 (Bankr. S.D.N.Y 2006); and *In re Global Home Products, LLC,* No. 06-10340 (KG), 2007 Bankr. LEXIS 758 (Bankr. D. Del. March 6, 2007).

In *Dana Corp.*, the debtors sought court approval of an executive compensation package, including a long term incentive plan, but took the position that Court approval

was not necessary with respect to a separate, short-term annual bonus program. *Dana Corp.*, 358 B.R. at 579-80. The short-term program was a "refinement of the [pre-petition] short-term incentive program, reflecting the current business conditions and a reduction in the number of participants, and [was] similar to [the debtor's] previous short-term incentive programs." *Id.* at 579. Applying the horizontal and vertical tests, the court in *Dana Corp.* found that the short-term incentive plan was within the ordinary course of the debtor's business. *Id.* at 581. In so ruling, the court specifically stated that a short-term incentive plan similar to that before the *Dana Corp.* court had "been a common component of compensation plans at [the debtor] for the past fifty years and does not differ significantly from [the debtor's] pre-petition practice." *Id.* Notwithstanding the ruling that the short-term incentive plan was within the ordinary course of the debtor's business, the court reviewed the short-term incentive plan "in the context of determining whether the overall compensation proposal is a proper exercise of [the debtor's] business judgment." *Id.*

In other words, while the court did not rule on the merits of the short-term incentive plan, it considered the payments to be made under the short-term plan as evidence

in determining the reasonableness of the long-term incentive plan, the adoption of which was not in the ordinary course of the debtor's business. Indeed, in approving the long-term incentive plan, the Court required the imposition of limits on the total compensation payable to the covered employees based, in part, on the payments to be made under the short-term plan. *Id.* at 583-84. In considering whether to approve the long-term incentive plan, the court, citing numerous cases, applied a number of factors generally used by courts to determine whether a compensation program established outside the ordinary course of business meets the "sound business judgment" test. *Id.* at 576-77.

A similar result was reached in *Global Home Products*. *Global Home Products*, 2007 Bankr. LEXIS 758. In *Global Home Products*, the debtors sought approval of a "performance and incentive based bonus plan" for senior management and an "incentive based sales bonus plan." *Id.* at *1. The focus of the court's opinion in *Global Home Products* is whether the proposed plans were retention or severance arrangements subject to review under section 503(c) of the Bankruptcy Code. *Id.* at *4-7. In addition, while not specifically applying the horizontal and vertical dimension tests, the court found that the adoption of the

incentive plans was "clearly in the ordinary course of the [d]ebtors' businesses." *Id.* at *7.  The court then found that the adoption of the incentive plans was a reasonable exercise of the debtors' business judgment, applying the factors identified by the *Dana Corp.* court. *Id.*

The modification of the 2006 OCP before the Court is very similar to the short-term incentive plan that the court in *Dana Corp.* found to be in the ordinary course of business.  Because the entire incentive program before the Court in this case is within the ordinary course of the Debtors' business judgment, however, the criteria developed in *Dana Corp.* for analyzing whether an incentive plan adopted outside the ordinary course of business is a reasonable exercise of a debtor's business judgment are not applicable here.  To the extent that the court in *Global Home Products* held that the *Dana Corp.* factors are applicable to an incentive program adopted in the ordinary course of a debtor's business, this Court respectfully disagrees with that holding.

Rather, since the modification of the 2006 OCP is within the ordinary course of the Debtors' business, the Court will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope

of authority under the Bankruptcy Code. *See In re Curlew Valley Associates*, 14 B.R. at 513. The evidence established that the Debtors' modification of the 2006 OCP involves a business judgment made in good faith upon a reasonable basis. Mr. Dias testified at length as to why the payment of bonuses under the modified 2006 OCP "made good business sense," notwithstanding the failure to achieve the lowest threshold for payment of bonuses under the original plan.

In addition, Mr. Visithpanich testified that the 2006 OCP as modified is reasonable because the total compensation (including base salary and all bonuses) to be paid to the Debtors' Level I and II employees is within market norms for companies comparable to the Debtors. Mr. Visithpanich's testimony on this point, however, is of limited utility because Mr. Visithpanich's analysis did not consider financial performance. For example, Mr. Visithpanich did not analyze whether the compensation to be paid to the Level I and II employees was within market norms for companies with poor financial performance.

Nonetheless, the evidence presented by the Debtors was more than sufficient to satisfy the relatively light evidentiary burden of establishing that the Debtors made a business judgment in good faith upon a reasonable basis.

*Id.* Whether that business judgment is "within the scope of authority under the Bankruptcy Code" is discussed below.

**Section 503(c)(1) of the Bankruptcy Code, which limits retention payments to insiders, is applicable to the Debtors' modification of the 2006 OCP.**

Section 503(c) of the Bankruptcy Code is the result of an amendment to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 331, 119 Stat. 23, 102-03 (2005), that was proposed by Senator Edward Kennedy during the Judiciary Committee's mark-up of the bill. *See Dana Corp.*, 358 B.R. at 575 (discussing the origins of Section 503(c) of the Bankruptcy Code). Although there is little in the way of legislative history, it is widely acknowledged that the amendment was a response to perceived abuses of the bankruptcy system by "the executives of giant companies . . . who lined their own pockets, but left thousands of employees and retirees out in the cold." *Id.* (quoting Statement of Senator Edward Kennedy (March 1, 2005)). In this vein, Section 503(c) imposes a variety of restrictions on the compensation that can be paid both to executives and other employees of companies that are in bankruptcy.

Section 503(c)(1) of the Bankruptcy Code limits retention payments that can be made to insiders of the debtor. Specifically, Section 503(c)(1) provides, subject

to certain exceptions not applicable in this case, that "[t]here shall neither be allowed, nor paid . . . a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1).

Relying on *Dana Corp.*, the Debtors argue that section 503(c)(1) is not applicable to the modification of the 2006 OCP because the modification was adopted in the ordinary course of the Debtors' business. *Dana Corp.*, 358 B.R. at 575 ("Section 503(c) . . . restricts transfers or payments by debtors to the extent that such payments are outside the ordinary course."). The Debtors argue that the holding in *Dana Corp.* is that section 503(c) *only* restricts payments made outside the ordinary course of business. As the word "only" does not appear in the sentence, the Court disagrees with the Debtors' interpretation. Nonetheless, to the extent that the court in *Dana Corp.* so held, this Court respectfully disagrees.

Nothing in section 503(c)(1) of the Bankruptcy Code limits its applicability to transactions or payments made outside the ordinary course of business. The only limitation in section 503(c)(1) is that the transfer be "for the benefit of, an insider of the debtor for the

purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1).  Under well-established canons of statutory construction, the Court need go no further than the plain meaning of the statute to determine its meaning. *Perrin v. United States*, 444 U.S. 37, 42 (1979) (The plain meaning rule stands for the fact that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").

This reading of the plain meaning of the statute is reinforced by the language of section 503(c)(3), which is part of the same amendment proposed by Senator Kennedy. Section 503(c)(3) provides that it is applicable to "transfers or obligations that are *outside* the ordinary course of business." 11 U.S.C. § 503(c)(3) (emphasis added).  Under the principle of *noscitur a sociis*, the meaning of an unclear word or phrase should be determined by the words immediately surrounding it. *James v. United States*, 127 S. Ct. 1586, 1605 (2007) (Scalia, J., dissenting).  "Of course *noscitur a sociis* is just an erudite (or some would say antiquated) way of saying what common sense tells us to be true: '[A] word is known by the company it keeps,' -- that is to say, which of various possible meanings a word should be given must be determined in a manner that makes it 'fit' with the words with which

it is closely associated. *Id.* (citing *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S. Ct. 1579 (1961)). The inclusion of the limiting language "outside the ordinary course of business" in section 503(c)(3) counsels against reading such a limitation into section 503(c)(1).

Thus, under the established canons of statutory construction, section 503(c)(1) of the Bankruptcy Code is applicable to the Debtors' modification of the 2006 OCP, provided that the payments under the bonus program are to "an insider of the debtor for the purpose of inducing such person to remain with the debtor's business."

**Modification of the 2006 OCP is not a transfer to "an insider of the debtor for the purpose of inducing such person to remain with the debtor's business."**

Having held that section 503(c)(1) is applicable, the Court must determine whether the modification of the 2006 OCP is, in fact, a transfer to an insider of the debtor for the purpose of inducing such person to remain with the debtor's business.

As a preliminary matter, section 503(c)(1) only applies to transfers to "insiders," which includes the directors and officers of the Debtors. 11 U.S.C. § 101(31). Only the Level I employees under the 2006 OCP are "insiders" as defined in the Bankruptcy Code. Thus, section 503(c)(1) does not preclude or restrict any

31

payments under the 2006 OCP to the Level II or Level III employees.[15]

The more difficult question is whether the bonus payments to the Level I employees under the modified 2006 OCP are "for the purpose of inducing such person to remain with the debtor's business." "It is well established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Tr.,* 540 U.S. 526, 534 (U.S. 2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6, 120 S. Ct. 1942 (2000) (in turn quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S. Ct. 1026 (1989) (in turn quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S. Ct. 192 (1917))))).

Any payment to an employee, including regular wages, has at least a partial purpose of retaining the employee. Therefore if the Court did not apply a materiality standard, all payments to insiders would be subject to 503(c)(1), which would be an absurd result. At the same time, applying a "sole purpose" standard goes too far.

---

[15] Neither does section 503(c)(1) restrict any payments to the Sales Directors, Sales Managers, Office Staff or Line Managers.

Thus, the Court reads section 503(c)(1) to mean "a transfer made to . . . an insider of the debtor for the *[primary]* purpose of inducing such person to remain with the debtor's business." 11 U.S.C §503(c)(1) (emphasis added).

This reading of section 503(c)(1) is consistent with the holdings in *Dana Corp.* and *Global Home Products*. The court in *Dana Corp.* held that "merely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature." *Dana Corp.*, 358 B.R. at 571. The court then held that "[b]y presenting an executive compensation package that properly [motivates senior management] to produce and increase the value of the estate, the [debtor has] established that section 503(c)(1) does not apply to [the debtor's motion]." *Id.* at 584.

Similarly, in discussing whether a bonus plan satisfies the criteria of section 503(c), the court in *Global Home Products* noted that "[t]he entire analysis changes if a bonus plan is not *primarily* motivated to retain personnel." *Global Home Products*, 2007 Bankr. LEXIS 758 at *6 (emphasis added). The court went on to find that:

> [the bonus plans] are primarily incentivizing and
> only coincidently retentive because [the debtors]
> employed virtually identical plans prepetition when

retention was not the motive.    The fact, as [the debtors] pointed out, that all compensation has a retention element does not reduce the Court's conviction that [the debtor's] primary goal [is] to create value by motivating performance.    All companies seek to retain employees by fairly compensating them.

Id. at *7.

Under the facts of this case, although the modification of the 2006 bonus program has some retentive effect, it is for the primary purpose of motivating employees and, thus, the limitations of section 503(c)(1) are not applicable.    Mr. Dias testified that the 2006 OCP was designed to motivate employees to "keep[] momentum going forward . . . in both sales and EBITDA."    He further testified that the target EBITDA of $43.2 million established in March 2006 was a "stretch" and did not take into account the possible negative effects to the Debtors' business that might result from the Debtors' bankruptcy.[16]

Mr. Dias also testified that the payment of bonuses under the modified 2006 OCP is justified, notwithstanding the failure to achieve the lowest threshold for payment of

---

[16] The testimony that the target EBITDA of $43.2 million established in March 2006 was a "stretch" is consistent with previous evidence before this Court in connection with a different matter. *See In re Nellson Nutraceutical, Inc.*, No. 06-10072 (CSS), 2007 Bankr. LEXIS 99 at *38-9 (Bankr. D. Del. Jan. 18, 2007) (In April, 2006, "Mr. Dias proposed a base revenue goal of $305 million and EBITDA of $41.05, *with the previous goals suggested at the March 16 Board Meeting of revenue $314 and EBITDA $43.02 being relegated to "stretch" goals*.") (emphasis added).

bonuses under the original plan, because the Debtors'
failure to achieve those targets was not a result of any
failure by the employees, who, in fact, had done a "great
job." Thus, Mr. Dias testified that it made "good business
sense" to modify the 2006 OCP to allow for payment of
bonuses even though the Debtors missed their EBITDA target.

Finally, both Mr. Dias and Mr. Visithpanich testified
that the payment of bonuses under the modified 2006 OCP was
consistent with the Debtors' pre-petition practices. Mr.
Dias went on to testify that departing from the pre-
petition practice would have an adverse affect on employee
morale.

The UST argues with some force that if an incentive
plan is based on achievement of EBITDA targets and those
targets are not achieved, yet the bonus is still received,
that the plan cannot be an incentive plan but must, in
fact, be solely a retention plan.

> [I]f you have an incentive plan that's analyzed
> after the fact and the incentive plan is based on
> achievement of EBITDA targets and you don't achieve
> those EBITDA targets but yet you still get a bonus
> . . . I don't understand what other purpose it
> could serve other than to be a retention plan when
> the threat is that it will cause destruction, and
> these people will leave.

Hr'g Tr. 196.

While the Court agrees that the payment of bonuses under the modified 2006 OCP has some retentive effect, the Court disagrees with the UST's argument that its sole or primary purpose is retention. Consistent with the Debtors' pre-petition practice, the 2006 OCP must be considered as a whole. It consists of two parts: the establishment of "aspirational goals" in the early part of the year; and a review at the end of the year to consider whether those goals have been met and, if not, why. In this case, the Debtors' did just that and determined that the 2006 OCP served its purpose by motivating the employees to do a "great job" in connection with the matters that those employees could reasonably be expected to influence. As such, the Debtors seek to award bonuses at a reduced level to compensate the employees for their success (albeit somewhat limited) in 2006 and to motivate the employees in 2007.

Thus, the Court finds that the bonus payments to the Level I employees under the modified 2006 OCP are not for the primary purpose of inducing the Level I employees to remain with the Debtors' business and, thus, they are not precluded or restricted by section 503(c)(1) of the Bankruptcy Code.

**Section 503(c)(3) of the Bankruptcy Code, which limits payments to officers, managers or consultants, is not applicable to the Debtors' modification of the 2006 OCP.**

Section 503(c)(3) of the Bankruptcy Code limits payment of obligations outside of the ordinary course of business that are not covered by subsection (1) or (2), providing:

> [there shall neither be allowed, nor paid-] (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).

Section 503(c)(3) applies to "officers, managers, or consultants" -- a broad category of employees that includes all Level I, II and III employees under the 2006 OCP.[17] Nonetheless, section 503(c)(3) only limits "transfers or obligations that are *outside* the ordinary course of business." 11 U.S.C. § 503(c)(3) (emphasis added). As discussed at length above, the Court finds that the Debtors' modification of the 2006 OCP was in the ordinary course of the Debtors' business. Thus, under the plain

---

[17] In addition, it would appear that the employees in the Sales Directors, Sales Managers and Line Managers categories under the 2006 OCP are covered by this section. It is unclear whether any employees in the Office Staff category are covered.

meaning of the statute, section 503(c)(3) is simply inapplicable here. *Perrin*, 444 U.S. at 42.

The UST argues that section 503(c)(3) should not be read so restrictively. Rather, the UST argues that section 503(c)(3) requires that all transfers to officers, managers, or consultants, including transfers outside the ordinary course of business, must be justified by the facts and circumstances of the case. The Court disagrees with the UST's reading of the statute.

In effect, the UST wants to rewrite section 503(c)(3) to read as follows:

> [there shall neither be allowed, nor paid-] (3) other transfers or obligations that are ~~outside the ordinary course of business and~~ not justified by the facts and circumstances of the case, including transfers **outside the ordinary course of business** and made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

In other words, the UST wants to read the phrase "outside the ordinary course of business" as illustrative as opposed to exclusive. While Senator Kennedy could certainly have written his amendment that way, he did not. Moreover, reading the statute as written does not lead to an absurd result. *See Lamie,* 540 U.S. at 534 (Where the disposition required by the text is not absurd the function of the Court is to apply the text as written). Indeed, such a

38

reading is wholly consistent with section 363 of the Bankruptcy Code, which is the source of the distinction between transfers within and outside the ordinary course of business and is "designed to allow a trustee (or debtor in possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *Roth American,* 975 F.2d at 952.

Thus, under the plain meaning of section 503(c)(1) of the Bankruptcy Code, the statute is inapplicable to the Debtors' modification of the 2006 OCP.[18]

**Conclusion**

In this case and under the facts established at the hearing, the Court finds that the Debtors' modification of the 2006 OCP was within the ordinary course of the Debtors' business. The Court further finds that section 503(c)(1) of the Bankruptcy Code is not applicable because the Debtors' modification of the 2006 OCP was not for the primary purpose of inducing employees to remain with the Debtors' business. Because section 503(c)(3) is also not applicable, the Court's inquiry is limited to the standard

---

[18] Having determined that section 503(c)(3) is inapplicable, the Court need not determine whether the modification of the 2006 OCP is "justified by the facts and circumstances of the case."

under section 363(c)(1), *i.e.*, whether the Debtors'
modification of the 2006 OCP was a business judgment made
in good faith upon a reasonable basis and within the scope
of authority under the Bankruptcy Code, which the Court
finds satisfied.

Debtors' counsel is instructed to submit a proposed
order consistent with this opinion under certification of
counsel.