IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) Case No. 06-10072 (CSS) |
| | ) (Jointly Administered) |
| Debtors. | ) |

## DISCLOSURE STATEMENT IN RESPECT OF CHAPTER 11 PLAN OF LIQUIDATION FOR NELLSON NUTRACEUTICAL, INC., ET AL.

### IMPORTANT DATES

- Date by which ballots must be received: September 3, 2008 at 4:00 p.m. (prevailing Eastern time)

- Date by which objections to Confirmation of the Plan must be filed and served: September 3, 2008 at 4:00 p.m. (prevailing Eastern time)

- Hearing on Confirmation of the Plan: September 10, 2008 at 11:00 a.m. (prevailing Eastern time)

Dated: July 25, 2008

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
Richard M. Pachulski (CA Bar No. 90073)
Brad R. Godshall (CA Bar No. 105438)
Maxim B. Litvak (CA Bar No. 215852)
Rachel Lowy Werkheiser (Bar No. 3753)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Counsel for Debtors and Debtors in Possession

---

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id. #0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #4689, (e) Nellson Nutraceutical Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc., a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

## Table of Contents

Page

I.     PREFATORY STATEMENT AND DEFINITIONS ......................................................... 1

II.    INTRODUCTION AND OVERVIEW ......................................................................... 1

       A.     Introduction ................................................................................................... 1

       B.     Disclaimers .................................................................................................... 2

       C.     An Overview of the Chapter 11 Process ........................................................ 3

       D.     Plan Overview ............................................................................................... 3

              1.     Summary of Classification and Treatment of Claims and Interests
                     Under the Plan ..................................................................................... 4

       E.     Voting on the Plan ......................................................................................... 8

              1.     Who May Vote ..................................................................................... 8

              2.     How to Vote ......................................................................................... 8

       F.     Confirmation of the Plan ............................................................................... 9

              1.     Generally ............................................................................................. 9

              2.     Objections to Confirmation .................................................................. 9

              3.     Hearing on Confirmation ................................................................... 10

III.   HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS ...................... 10

       A.     Description of the Debtors ........................................................................... 10

       B.     The Debtors' Corporate Structure and Financial Performance ...................... 11

       C.     The Debtors' Principal Indebtedness ............................................................ 11

       D.     Need for Bankruptcy Relief ......................................................................... 12

       E.     First Day Motions and Other Post-Petition Activities .................................. 12

              1.     Joint Administration ........................................................................... 13

              2.     Employees .......................................................................................... 13

              3.     Cash Management ............................................................................... 13

|     | 4.  | Utilities ................................................................................................. 14 |
|     | 5.  | Interim Compensation for Professionals ................................................... 14 |
|     | 6.  | Lease Rejection ................................................................................. 14 |
|     | 7.  | Retention of Key Professionals ............................................................. 15 |
|     | 8.  | Ordinary Course Professionals .............................................................. 16 |
|     | 9.  | Critical Trade .................................................................................... 16 |
|     | 10. | Customer Programs ............................................................................. 16 |
|     | 11. | Cash Collateral Use and DIP Financing .................................................. 16 |
|     | 12. | 503(b)(9) Claims and Settlement Procedures .......................................... 17 |
|     | 13. | Bariatrix Stay Relief Motion................................................................. 17 |
|     | 14. | Lease Assumption .............................................................................. 18 |
|     | 15. | Exclusivity Extensions......................................................................... 18 |

| F. | Appointment of Official Committee ....................................................... 18 |
| G. | Bar Date for Filing Proofs of Claim and Administrative Proofs of Claims.......... 19 |
| H. | Filing of Statements and Schedules ....................................................... 19 |
| I. | Management Incentive Program ............................................................. 19 |
| J. | Appointment of Examiner..................................................................... 20 |
| K. | Valuation Litigation ............................................................................. 20 |
| L. | Proposed Settlement with Fremont and the Agent, on Behalf of the Second Lien Lenders ................................................................. 21 |
| M. | Ordinary Course Bonus Motion.............................................................. 22 |
| N. | Sale of Substantially All of the Debtors' Assets........................................ 22 |
| O. | Partial Payment to "Non-Participating" First Lien Lenders ................................ 23 |
| P. | Preference Actions .............................................................................. 23 |
| IV. | ESTATE ASSETS AND PROJECTED CREDITOR RECOVERIES............................. 23 |
| A. | Estate Assets ...................................................................................... 23 |

|   | B. | The Elan Litigation ................................................................................. 24 |
|   | C. | Projected Creditor Recoveries ............................................................... 25 |
| V. | | DESCRIPTION OF THE PLAN ................................................................. 25 |
| VI. | | GLOBAL SETTLEMENT AND RELEASES INCORPORATED IN THE PLAN ........ 26 |
|   | A. | Description of the Settlement.................................................................. 26 |
|   | B. | Applicable Legal Standard...................................................................... 27 |
|   | C. | The Estate Releases Should Be Approved............................................. 27 |
| VII. | | TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS ................. 29 |
|   | A. | Introduction............................................................................................ 29 |
|   | B. | Administrative Expenses ........................................................................ 29 |
|   | C. | Superpriority Claims.............................................................................. 29 |
|   | D. | Payments to Lenders' Professionals ...................................................... 30 |
|   | E. | Tax Claims ............................................................................................. 30 |
| VIII. | | CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ............................................................................................ 31 |
|   | A. | Summary................................................................................................. 31 |
|   | B. | Classification and Treatment of Claims and Interests ........................... 31 |
|   |   | 1. Class 1 – Priority Non-Tax Claims............................................ 31 |
|   |   | 2. Class 2 – Other Secured Claims................................................. 32 |
|   |   | 3. Class 3 – First Lien Lender Claims............................................ 32 |
|   |   | 4. Class 4 – Second Lien Lender Claims ........................................ 33 |
|   |   | 5. Class 5 – General Unsecured Claims.......................................... 33 |
|   |   | 6. Class 6 – Subordinated Debt Claims .......................................... 34 |
|   |   | 7. Class 7 – Interests in the Debtors.............................................. 34 |
| IX. | | ACCEPTANCE OR REJECTION OF PLAN.................................................. 34 |
|   | A. | Identification of Unimpaired Classes..................................................... 34 |

| | B. | Identification of Impaired Classes | 34 |
|---|---|---|---|
| | C. | Classes Permitted and Not Permitted to Vote | 35 |
| | D. | Nonconsensual Confirmation | 35 |
| | E. | Postpetition Interest | 36 |
| X. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 36 |
| | A. | Continued Corporate Existence and Vesting of Assets | 36 |
| | B. | Retained Rights of Action | 36 |
| | C. | Corporate Governance | 36 |
| | D. | Wind-Down | 37 |
| | E. | Funding for the Plan | 39 |
| | F. | Substantive Consolidation | 39 |
| | G. | Settlement of Intercompany Matters | 39 |
| | H. | Settlement with the Lenders | 40 |
| | I. | Settlement with Holders of Subordinated Debt Claims | 40 |
| | J. | Settlement with Debtors' Officers and Directors; Disallowance of Indemnification Claims | 40 |
| | K. | Corporate Action/Dissolution | 41 |
| | L. | Interests in Affiliates and Subsidiaries | 41 |
| | M. | Payment of Plan Expenses | 41 |
| | N. | Dissolution of the Official Committee | 42 |
| XI. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 42 |
| | A. | Rejection of Executory Contracts and Unexpired Leases | 42 |
| | B. | Bar Date for Rejection Damages | 42 |
| XII. | | DISTRIBUTIONS AND RELATED MATTERS | 42 |
| | A. | Dates of Distribution | 42 |
| | B. | Cash Distributions | 43 |

| | C. | Rounding of Payments | 43 |
|---|---|---|---|
| | D. | Disputed Claims | 43 |
| | E. | Undeliverable and Unclaimed Distributions | 44 |
| | F. | Compliance with Tax Requirements | 44 |
| | G. | Record Date in Respect to Distributions | 44 |
| | H. | Reserves | 45 |
| XIII. | | LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES | 45 |
| | A. | Litigation; Objections to Claims; Objection Deadline | 45 |
| | B. | Temporary or Permanent Resolution of Disputed Claims | 46 |
| | C. | Setoffs | 46 |
| | D. | Preservation of Retained Rights of Action | 46 |
| XIV. | | RELEASE, WAIVER AND RELATED PROVISIONS | 47 |
| | A. | Injunctions | 47 |
| | | 1. Generally | 47 |
| | | 2. Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests | 47 |
| | B. | Exculpation | 48 |
| | C. | Estate Releases of Executives, Lenders, and Holders of Subordinated Debt Claims | 48 |
| | D. | Estate Release of Avoidance Claims | 48 |
| XV. | | PENSION PLANS, OTHER RETIREE BENEFITS AND LABOR CONTRACTS | 49 |
| XVI. | | NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL | 49 |
| XVII. | | EXEMPTION FROM CERTAIN TRANSFER TAXES | 49 |
| XVIII. | | RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS | 49 |
| | A. | Retention of Jurisdiction | 49 |
| XIX. | | REQUIREMENTS FOR CONFIRMATION | 52 |

| | A. | Acceptances Necessary to Confirm Plan | 52 |
|---|---|---|---|
| | B. | Best Interest of Creditors Test | 52 |
| | C. | Feasibility of Plan | 54 |
| | D. | Classification | 54 |
| | E. | Confirmation of Plan Without Necessary Acceptances; Cramdown | 54 |
| XX. | | EFFECT OF CONFIRMATION | 56 |
| | A. | Binding Effect of Confirmation | 56 |
| | B. | Good Faith | 56 |
| | C. | No Limitations on Effect of Confirmation | 56 |
| XXI. | | RISK FACTORS | 56 |
| XXII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 56 |
| | A. | Consequences to Debtors | 57 |
| | | 1. Holders of Claims. | 58 |
| | | 2. Non-United States Persons. | 58 |
| | | 3. Importance of Obtaining Professional Tax Assistance. | 58 |
| XXIII. | | ALTERNATIVES TO PLAN | 59 |
| | A. | Liquidation Under Chapter 7 | 59 |
| | B. | Dismissal | 59 |
| | C. | Alternative Plan | 59 |
| | D. | No Res Judicata Effect | 59 |
| XXIV. | | CONCLUSION | 60 |

**Exhibits**

| Exhibit | Description |
|---|---|
| 1 | Plan |
| 2 | Disclosure Statement Order |
| 3 | Pending Avoidance Claims |
| 4 | Analysis of Plan Distributions and Creditor Recoveries |

# I.

# PREFATORY STATEMENT AND DEFINITIONS

Pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the "Bankruptcy Code"), Nellson Nutraceutical, Inc. ("NNI") and its affiliated Debtors, Nellson Holdings, Inc. ("Nellson Holdings", Nellson Intermediate Holdings, Inc. ("NIH"), Nellson Northern Operating, Inc. ("Nellson Northern"), Nellson Nutraceutical Eastern Division, Inc. ("Nellson Eastern"), Nellson Nutraceutical Powder Division, Inc. ("Nellson Powder"), and Vitex Foods, Inc. ("Vitex") (collectively, the "Debtors"), hereby submit this disclosure statement (the "Disclosure Statement") in support of the *Chapter 11 Plan of Liquidation for Nellson Nutraceutical, Inc., et al.* (the "Plan"). The definitions contained in the Bankruptcy Code are incorporated herein by this reference. The definitions set forth in Article II of the Plan shall also apply to capitalized terms used herein that are not otherwise defined.

# II.

# INTRODUCTION AND OVERVIEW

## A.     Introduction

On January 28, 2006 (the "Petition Date"), the Debtors commenced the above-referenced bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtors. A copy of the Plan is attached to the Disclosure Statement as Exhibit 1. The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement contains information concerning, among other matters: (1) the Debtors' background; (2) the assets available for distribution under the Plan; and (3) a summary of the Plan. The Debtors strongly urge you to review carefully the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

On July 25, 2008, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. A copy of the order approving the Disclosure Statement [Docket No. 2209] is attached hereto as Exhibit 2 (the "Disclosure Statement Order"). Under section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not passed on the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays or a chapter 7 liquidation. These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than September 3, 2008, at 4:00 p.m. prevailing Eastern Time.

## B. Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS. PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH PSZ&J HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, COUNSEL HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

2

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE
CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR
INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND
ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR
HER CLAIM.

## C.     An Overview of the Chapter 11 Process

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of
which is to provide the debtor with "breathing space" within which to propose a restructuring of
its obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a
bankruptcy "estate" comprising all of the property interests of the debtor. Unless a trustee is
appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Chapter 11
Cases), a debtor remains in possession and control of all its assets as a "debtor in possession."
The debtor may continue to operate its business in the ordinary course on a day-to-day basis
without Bankruptcy Court approval. Bankruptcy Court approval is only required for various
enumerated kinds of transactions (such as certain financing transactions) and transactions out of
the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to
what is known as the "automatic stay" which, generally, enjoins creditors from taking any action
to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11
case. The Bankruptcy Court can grant relief from the automatic stay under certain specified
conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to
protect the interests of some or all creditors or interest holders. The fees and expenses of counsel
and other professionals employed by such official committees and approved by the Bankruptcy
Court are generally borne by a bankruptcy estate. One Official Committee has been appointed in
these Chapter 11 Cases, which represents the collective interests of general unsecured creditors.

A Chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of
reorganization. Alternatively, the assets of a debtor may be sold and the proceeds distributed to
creditors through a plan of liquidation, such as the Plan. A plan may be either consensual or
non-consensual and provide, among other things, for the treatment of the claims of creditors and
interests of shareholders and holders of options or warrants. The provisions of the Debtors' Plan
are summarized below.

## D.     Plan Overview

The following is a brief overview of the material provisions of the Plan and is qualified in
its entirety by reference to the full text of the Plan. The Plan is a plan of liquidation (as
discussed below).

The Plan effectuates the terms of an agreement and settlement amongst the Debtors and
their principal creditor constituents and equity holders as to the means for distributing the
remaining assets of the Debtors' Estates and winding-up the Debtors' affairs. Under the Plan
and in accordance with the priorities set forth in the Bankruptcy Code and as part of the series of
compromises contained in the Plan, the Debtors' First Lien Lenders receive the bulk of the

remaining assets in the Estates in the form of cash distributions, after setting aside $2.0 million in Cash for Second Lien Lenders, nearly $2.5 million in Cash for various professionals employed by the Lenders, and additional Cash reserves sufficient to satisfy all other Allowed Administrative Expenses, Priority Claims and Wind-Down costs. Holders of General Unsecured Claims are released of any potential Avoidance Claims, but receive no other distributions under the Plan. Finally, as part of a global settlement incorporated in the Plan, Holders of Subordinated Debt Claims, and each of the Debtors' Executives, shall have the opportunity to enter into certain releases. Holders of Subordinated Debt Claims and Executives shall receive no other distributions under the Plan. All Interests in the Debtors shall be cancelled.

Taken together, the Plan proposes to fairly and efficiently allocate the Debtors' remaining assets in a manner that is supported by all of the principal constituencies in these cases and will allow these cases to be promptly resolved. **The Plan has the support of all major constituencies in these Chapter 11 Cases, including UBS AG, as Agent, the Informal Committee of First Lien Lenders, and the Official Committee of Unsecured Creditors.**

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. The Plan designates six (6) Classes of Claims and one (1) Class of Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests. Pursuant to the Plan, the Debtors will ultimately be dissolved and all existing Interests in the Debtors will be extinguished and cancelled.

## 1.    Summary of Classification and Treatment of Claims and Interests under the Plan

The following chart briefly summarizes the treatment of Creditors and Interest Holders under the Plan.[2] Amounts listed below are estimated. Actual Claims and distributions will vary depending upon, among other things, recoveries on Distributable Assets.

a.    Unclassified Claims

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| N/A | Administrative Expenses<br><br>Estimated Recovery: 100% | $1,718,000 (inclusive of accrued but unpaid professional fees) | Each Holder of an Allowed Administrative Expense will receive Cash equal to the amount of such Allowed Administrative Expense, unless otherwise agreed. |

---

[2] This chart is merely a summary of the classification and treatment of Claims and Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| N/A | Superpriority Claims<br><br>Estimated Recovery: N/A | $100 million | The Superpriority Claims granted to the Lenders pursuant to the Final Cash Collateral Order are Allowed in the amount of $100 million with respect to the First Lien Lenders; provided that (a) no distribution to the First Lien Lenders shall be made on account of such Allowed Superpriority Claims except as set forth in Article IV(B)(3) of the Plan; and (b) any Superpriority Claims held by the Second Lien Lenders shall be subordinated to the Superpriority Claims held by the First Lien Lenders and no distribution to the Second Lien Lenders shall be made on account thereof except as set forth in Article IV(B)(4) of the Plan. |
| N/A | Tax Claims<br><br>Estimated Recovery: 100% | $30,300 | As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against any of the Debtors will receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Tax Claim, Cash equal to the portion of the Allowed Tax Claim due and payable on or prior to the Effective Date according to applicable non-bankruptcy law. Any Allowed Tax Claim (or portion thereof) against any of the Debtors not yet due and payable as of the Effective Date will be paid by the Debtors no later than when due and payable under applicable non-bankruptcy law without regard to the commencement of the Chapter 11 Cases; provided that (1) any default prior to the Effective Date with respect to Tax Claims against any of the Debtors shall be deemed cured and (2) upon request of any of the Debtors, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, Tax Claims. |

b.  Classified Claims

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| 1 | Priority Non-Tax Claims<br><br>Estimated Recovery: 100% | $0 | At the election of the Debtors, the Holder of each Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Priority Non-Tax Claim, a Cash payment equal to the Allowed amount of such Claim (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim; or (b) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the Holders of such Claims and any of the Debtors, as the case may be. |

59903-002\DOCS_SF:59544.4

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| 2 | Other Secured Claims<br><br>Estimated Recovery: 100% | $0 | On or as soon as practicable after the Effective Date, at the election of the Debtors and in full satisfaction, settlement, release, extinguishment, and discharge of such Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, on account of such Claim, either: (i) be paid in Cash in full, (ii) have surrendered to such Holder, without representation or warranty, the collateral securing its Claim, (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Other Secured Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (A) be paid a cure of any such default that occurred prior to the Effective Date, other than a default of a kind specified in section 365(b)(2) of this title, (B) have reinstated the maturity of such Other Secured Claim as such maturity existed before such default, (C) be compensated for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (D) otherwise not have altered the legal, equitable, or contractual rights to which such Other Secured Claim entitles the Holder of such Claim, or (iv) have left unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim. |
| 3 | First Lien Lender Claims<br><br>Estimated Recovery: 48.6% (inclusive of prior distribution)[3] | $255 million | On or as soon as practicable after the Effective Date, each First Lien Lender shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such First Lien Lender Claim, the following: (i) a Pro Rata share (calculated as a percentage of First Lien Lender Claims) of the First Lien Distributable Assets to be distributed by the Agent as of the Record Date in accordance with the First Lien Credit Agreement; (ii) a release of any Rights of Action held by the Debtors, their Estates, and the Official Committee and its members (acting in such capacity); and (iii) only as to those First Lien Lenders that execute the Lender Release, a release of any Rights of Action held by the Agent upon execution of the Agent Release, the Executives that execute the Executive Release, and the Holders of Subordinated Debt Claims who execute the Subordinated Debt Holder Release. All distributions to the First Lien Lenders under the Plan shall be effectuated through the Agent (i.e., the Debtors shall distribute Cash to the Agent and the Agent shall make distributions to the First Lien Lenders). |

---

[3] See attached <u>Exhibit 4</u> for detailed distribution analysis to First Lien Lenders. Note that the estimated recovery of 48.6% includes $1.5 million in cash held in escrow pending release by Canadian taxing authorities. The date when this escrow will be released is unknown.

6

| Class No. | Description | Estimate of Claim Amounts Ultimately Allowable | Treatment |
|---|---|---|---|
| 4 | Second Lien Lender Claims<br><br>Estimated Recovery: 2.7% | $75 million | On or as soon as practicable after the Effective Date, each Second Lien Lender shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Second Lien Lender Claim, the following: (i) a Pro Rata share (calculated as a percentage of Second Lien Lender Claims) of $2.0 million in Cash to be distributed by the Agent as of the Record Date in accordance with the Second Lien Credit Agreement; (ii) a release of any Rights of Action held by the Debtors, their Estates, and the Official Committee and its members (acting in such capacity); and (iii) only as to those Second Lien Lenders that execute the Lender Release, a release of any Rights of Action held by the Agent upon execution of the Agent Release, the Executives that execute the Executive Release, and the Holders of Subordinated Debt Claims who execute the Subordinated Debt Holder Release. All distributions to the Second Lien Lenders under the Plan shall be effectuated through the Agent (i.e., the Debtors shall distribute Cash to the Agent and the Agent shall make distributions to the Second Lien Lenders). |
| 5 | General Unsecured Claims<br><br>Estimated Recovery: 0% | $0 | Holders of General Unsecured Claims against the Debtors shall receive no distributions or recoveries on account of such Claims and such Claims shall be extinguished on the Effective Date. However, Holders of General Unsecured Claims shall benefit from the Debtors' general release of Avoidance Claims set forth in Article X(D) of the Plan. |
| 6 | Subordinated Debt Claims<br><br>Estimated Recovery: 0% | $0 | On the Effective Date, in full satisfaction, settlement, release, extinguishment, and discharge of (a) all rights of Holders of Subordinated Debt Claims against Nellson Holdings, including but not limited to any rights of Nellson Holdings to assert Intercompany Claims, and (b) all Claims and Administrative Expenses asserted by the Holders of the Subordinated Debt Claims against any of the Debtors, each Holder of a Subordinated Debt Claim that executes the Subordinated Debt Holder Release shall be released of any Rights of Action held by the Debtors, their Estates, the Lenders that execute the Lender Release, the Agent upon execution of the Agent Release, the Executives that execute the Executive Release, and the Official Committee and its members (acting in such capacity). |
| 7 | Interests in the Debtors<br><br>Estimated Recovery: 0% | $0 | Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and such Interests shall be extinguished on the Effective Date. |

7

## E.    Voting on the Plan

### 1.    Who May Vote

The Plan divides Allowed Claims and Interests into multiple Classes. Under the Bankruptcy Code, only Classes that are "impaired" by the Plan are entitled to vote (unless the Class receives no compensation or payment, in which event the Class is conclusively deemed not to have accepted the Plan). A Class is Impaired if legal, equitable or contractual rights attaching to the Claims or Interests of the Class are modified, other than by curing defaults and reinstating maturities. Under the Plan, Administrative Claims and Priority Tax Claims are unclassified and are not entitled to vote. Classes 1 and 2 are unimpaired and are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote under the Plan. Classes 5 and 7 receive nothing under the Plan and are therefore conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote under the Plan. Classes 3, 4, and 6 are Impaired and entitled to vote to accept or reject the Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether a sufficient number of acceptances have been received to obtain Plan Confirmation.

### 2.    How to Vote

All votes to accept or to reject the Plan must be cast by using the appropriate form of ballot. No votes other than ones using such ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of ballot is being provided to Creditors in Classes 3, 4, and 6 by which Creditors in such Classes may vote their acceptance or rejection of the Plan. The ballot for voting on the Plan gives Holders of Classes 3, 4 and 6 Claims one important choice to make with respect to the Plan – you can vote for or against the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the ballot, as indicated thereon, (1) by indicating on the enclosed ballot that (a) you accept the Plan or (b) reject the Plan and (2) by signing your name and mailing the ballot in the envelope provided for this purpose. AlixPartners, LLP ("AlixPartners"), as the Balloting Agent, will count the ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE BALLOTING AGENT, ALIXPARTNERS, NO LATER THAN 4:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 3, 2008 AT THE FOLLOWING ADDRESS:

**Nellson Nutraceutical, Inc., et al.**
**c/o AlixPartners, LLP**
**2100 McKinney Avenue, Suite 800**
**Dallas, Texas 75201**

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST

TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY
TRANSMITTED BALLOTS WILL NOT BE COUNTED.

## F.     Confirmation of the Plan

### 1.     Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of
reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy
Court in deciding whether to confirm a plan of reorganization are discussed in Article XIX
below.

### 2.     Objections to Confirmation

Any objections to Confirmation of the Plan must be in writing and must be filed with the
Clerk of the Bankruptcy Court and served on counsel for the Debtors and the United States
Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with
this Disclosure Statement and the Plan. Bankruptcy Rule 3007 governs the form of any such
objection.

Counsel on whom objections must be served are:

| Counsel for the Debtors: | Counsel for the Agent: |
|---|---|
| Pachulski Stang Ziehl & Jones LLP<br>Laura Davis Jones, Esquire<br>Rachel Lowy Werkheiser, Esquire<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE  19899-8705 (Courier 19801) | Duane Morris LLP<br>Richard W. Riley, Esquire<br>1100 North Market Street, Suite 1200<br>Wilmington, DE  19801<br><br>and |
| and<br><br>Pachulski Stang Ziehl & Jones LLP<br>Maxim B. Litvak, Esquire<br>150 California Street, 15th Floor<br>San Francisco, CA  94111 | Milbank, Tweed, Hadley & McCloy LLP<br>Gregory A. Bray, Esquire<br>Thomas R. Kreller, Esquire<br>601 South Figueroa Street, 30th Floor<br>Los Angeles, CA  90017 |
| United States Trustee: | Counsel for the Official Committee: |
| Office of the United States Trustee<br>William K. Harrington, Esquire<br>J. Caleb Boggs Federal Building<br>844 N. King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE  19801 | Reed Smith LLP<br>Kurt F. Gwynne, Esquire<br>Claudia Springer, Esquire<br>1201 Market Street, Suite 1500<br>Wilmington, DE  19801 |

9

**Counsel for the Informal Committee:**

Young Conaway Stargatt & Taylor LLP
Robert S. Brady, Esquire
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

and

Akin Gump Strauss Hauer & Feld LLP
Fred Hodara, Esquire
590 Madison Avenue, 19th Floor
New York, NY 10022-2524

**Counsel for Fremont:**

Richards Layton & Finger, P.A.
Mark D. Collins, Esquire
Russell C. Silberglied, Esquire
One Rodney Square
920 North King Street
Wilmington, DE 19801

and

O'Melveny & Myers LLP
Suzanne Uhland, Esquire
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305

### 3. Hearing on Confirmation

The Bankruptcy Court has set September 10, 2008 at 11:00 a.m. (prevailing Eastern time) for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for confirmation of the Plan have been satisfied. The Confirmation Hearing will be held in Courtroom 6, Wilmington, DE 19801, before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

### III.

### HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS

### A. Description of the Debtors

Prior to a postpetition sale of substantially all operating assets described further below, the Debtors were leading formulators and manufacturers of functional nutrition bars and powders. The Debtors manufactured food bars and powders for weight loss, sports training and wellness and medical categories. As of the Petition Date, the Debtors had approximately 425 employees in the United States and, through a non-debtor Canadian subsidiary, approximately 784 employees in Canada. The Debtors' headquarters and principal manufacturing facility was located in Irwindale, California. Specifically, the Debtors (and their non-debtor Canadian affiliate) operated three highly modern manufacturing facilities, which were located in Irwindale, California, Salt Lake City, Utah and Montreal, Canada.

The Debtors did not manufacture products under their own label, but produced for leading industry functional food marketers. As a result of such relationships, the Debtors were the clear market leader with over 50% of the functional bar market and over three times the sales of their next largest bar competitor.

59903-002\DOCS_SF:59544.4

The Debtors typically provided the majority of the product lines of their customers under two to three-year exclusive contracts with pre-established pricing and had long-term contracts in place with certain key customers. Unique to this type of company, the Debtors owned the rights to the majority of the formulations developed for customers and held proprietary knowledge with regard to temperatures, mix times, order of addition and other preparation procedures around these formulations.

## B.    The Debtors' Corporate Structure and Financial Performance

NNI is wholly-owned by NIH, which in turn, is owned by Nellson Holdings. Nellson is the direct parent and sole shareholder of Nellson Northern, Vitex and Nellson Eastern. Vitex is the sole shareholder of Nellson Powder. In 2003, Nellson acquired a Canadian manufacturer of nutritional bars and powders called Bariatrix Products International, Inc., which then became Nellson's wholly-owned, non-debtor operating subsidiary in Canada called Nellson Nutraceutical Canada, Inc. ("Nellson Canada"). The Debtors are privately held companies. Their principal ultimate equity holder (by way of Nellson Holdings and NIH) is Fremont. As mentioned below, Fremont is also a substantial creditor of Nellson Holdings, with $39.5 million of unsecured debt.

The Debtors' consolidated revenues for all business segments (including Nellson Canada) for calendar year 2005 totaled approximately $300 million. The Debtors generated positive earnings for 2005 (before deductions for interest, taxes, depreciation and amortization) in the amount of approximately $40 million. For calendar year 2004, the Debtors' consolidated revenues totaled approximately $350 million, with earnings (before deductions for interest, taxes, depreciation and amortization) in the amount of $53 million and a net gain in the amount of approximately $4 million.

## C.    The Debtors' Principal Indebtedness

The Debtors (with the exception of Nellson Holdings and NIH) have three tranches of principal indebtedness consisting of (1) first priority secured obligations to various lenders (the "First Lien Lenders") under that certain *Amended and Restated Credit Agreement* dated as of July 3, 2003 (as amended, modified or supplemented, the "First Lien Credit Agreement"), pursuant to which UBS AG, Stamford Branch is the administrative agent and collateral agent (the "Agent"); (2) second priority secured obligations to various lenders (the "Second Lien Lenders" and collectively with the First Lien Lenders, the "Lenders") under that certain *Second Lien Credit Agreement* dated as of February 11, 2004 (as amended, modified or supplemented, the "Second Lien Credit Agreement"), pursuant to which UBS is also the administrative agent and collateral agent; and (3) unsecured obligations to trade vendors, lessors, and others.

Nellson is the borrower and the other Debtors (with the exception of Nellson Holdings and NIH) are guarantors under both the First Lien Credit Agreement and the Second Lien Credit Agreement (together, the "Credit Agreements"). The Debtors' obligations under the Credit Agreements are secured by first and second liens, respectively, on substantially all of the Debtors' assets. NIH has also pledged the stock of NNI to further secure the obligations under the Credit Agreements.

11

As of the Petition Date, the Debtors' outstanding principal obligations under the First Lien Credit Agreement totaled approximately $255 million. The Debtors' principal obligations under the Second Lien Credit Agreement totaled approximately $75 million as of the Petition Date.

The Debtors' remaining indebtedness consists of unsecured debt totaling approximately $5 million to 7 million, exclusive of intercompany obligations. Nellson Holdings also has unsecured subordinated debt obligations to Fremont in the original principal amount of $39.5 million. Nellson Holdings, however, has no other material outstanding liabilities and may have intercompany claims against the other Debtors.

## D.    Need for Bankruptcy Relief

Beginning in the latter part of 2004 and continuing through 2005, the Debtors' business was negatively impacted by a sequence of factors, including weaknesses in the market for nutritional bars and powders and challenges in the company's production processes. As a general matter, the market for nutritional bars and powders experienced a substantial downturn as a result of a waning low-carb diet trend and an overall softness in the weight-management industry. Concurrently with such market fluctuation, the Debtors lost a significant customer and experienced productivity issues that reduced margins within the company's bar manufacturing facilities. The Debtors began to address these challenges pro-actively by expanding the company's marketing efforts to drive higher revenues and pursuing various initiatives, including cost-savings measures, to resolve any performance gaps. Through these initiatives, the Debtors expected to increase their profitability back to historic levels.

Nonetheless, in November 2004, the Debtors' operational performance triggered certain defaults of financial covenants in the Credit Agreements. As a result, the Lenders and the Debtors commenced discussions regarding a restructuring of the company's debt and equity structure. On December 21, 2005, the Agent sent notices of acceleration of the Debtors' obligations under the Credit Agreements to the Debtors and Fremont. The Debtors, Fremont and the Agent continued to engage in negotiations in an effort to reach a consensual restructuring, but were unable to reach a resolution. The Debtors therefore commenced these cases in order to reorganize the Debtors' affairs.

## E.    First Day Motions and Other Post-Petition Activities

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or around the same time as, their voluntary petitions. The Debtors sought this relief to minimize disruption of the Debtors' business operations as a result of the chapter 11 filing, to establish procedures in the Chapter 11 Cases regarding the administration of the Chapter 11 Cases and to facilitate reorganization efforts. Specifically, the First Day Motions and other critical motions during the Chapter 11 Cases addressed the following issues, among others:

1. **Joint Administration**

On the Petition Date, the Debtors filed their *Motion for Entry of Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 2]. The seven Debtors in these cases are affiliated entities. The Debtors' consolidated creditor matrices list approximately 4,000 potential creditors and parties in interest. The joint administration of the Debtors' Chapter 11 Cases permitted the Clerk of the Bankruptcy Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which resulted in significant savings to the estates.

On January 31, 2006, the Bankruptcy Court entered its order directing joint administration of these Chapter 11 Cases [Docket No. 29].

2. **Employees**

On the Petition Date, the Debtors filed their *Motion of the Debtors for an Order: (i) Authorizing the Debtors to Pay and Honor Certain Prepetition Employee Obligations and Programs and to Continue Employee Benefit Plans and Programs Postpetition; (ii) Authorizing Banks to Honor Checks for Payment of the Foregoing; and (iii) Granting Related Relief* [Docket No. 13] (the "Wages Motion").

As of the Petition Date, the Debtors employed approximately 428 employees, of whom approximately 111 were salaried and approximately 317 were hourly employees (collectively, the "Employees"). Approximately 275 of the Debtors' regular Employees were located in California and approximately 145 Employees are located in Utah. The Debtors also had approximately 8 Employees in New York. In addition, the Debtors' workforce included anywhere from 600 to 1,050 temporary personnel (the "Temporary Employees") provided through various staffing agencies. None of the Debtors' Employees or Temporary Employees was subject to a collective bargaining agreement with the Debtors.

On January 31, 2006, the Bankruptcy Court entered its order authorizing the payment of certain prepetition Employee related claims and the continuation of certain Employee benefits postpetition [Docket No. 37].

3. **Cash Management**

On the Petition Date, the Debtors filed their *Motion of the Debtors for an Order (a) Authorizing the Debtors to Continue to Use Their Existing Cash Management System, Bank Accounts, Checks and Business Forms; (b) Providing Administrative Priority Status to Postpetition Intercompany Claims, and (c) Approving the Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 10].

Prior to the commencement of these cases, the Debtors (or some of them), in the ordinary course of business, maintained bank accounts with Wells Fargo and a bank account with Community Bank, N.A. The Debtors also maintained investment accounts with an affiliate of Wells Fargo, Wells Fargo Brokerage Services, LLC.

13

The Bankruptcy Court entered its interim order granting the relief requested by the Debtors in respect of their cash management system and related relief on January 31, 2006 [Docket No. 35] and a final order on March 24, 2006 [Docket No. 246].

On June 9, 2006, the Debtors filed a motion to modify the cash management system in order to transition their cash management systems, including all current deposit and securities accounts maintained with Wells Fargo and subject to the Wells Fargo Restricted Account Agreement, to City National Bank [Docket No. 419]. On June 23, 2006, the Bankruptcy Court approved the relief requested and entered its *Order Approving Stipulation Between the Debtors and UBS Concerning Modification of Cash Management Systems Subject to Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code Authorizing the Use of Cash Collateral and Granting Adequate Protection to UBS* [Docket No. 443].

### 4.     Utilities

On the Petition Date, the Debtors filed their *Motion of the Debtors for Order Under Section 366 of the Bankruptcy Code (a) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance and (c) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 7].

On February 24, 2006, the Bankruptcy Court entered its order implementing the procedures proposed by the Debtors to ensure adequate assurance of future payment to utility service providers [Docket No. 133].

### 5.     Interim Compensation for Professionals

On the Petition Date, the Debtors filed their *Motion of the Debtors for an Administrative Order Establishing Procedures for Interim Monthly Compensation of Professionals* [Docket No. 15].

The Debtor sought authority to implement procedures for the application, interim allowance and payment of Professional Persons on a monthly basis. On February 22, 2006, the Bankruptcy Court entered its order approving the monthly compensation procedures proposed by the Debtors [Docket No. 119].

On March 6, 2006, the Bankruptcy Court appointed Warren H. Smith & Associates, P.C. (the "Fee Auditor") as fee auditor is these Chapter 11 Cases [Docket No. 174]. Pursuant to this Order, the Fee Auditor has been reviewing all of the Professional Persons' fees and expenses and has been making recommendations to the Bankruptcy Court regarding same.

### 6.     Lease Rejection

On the Petition Date, the Debtors filed their *Motion of the Debtors for an Order Under Section 365(a) of the Bankruptcy Code Authorizing the Rejection of Unexpired Nonresidential Real Property Lease in Cato, New York* [Docket No. 16]. Nellson Eastern was the lessor of nonresidential real property in Cato, New York (the "Real Property Lease") that was no longer necessary for the Debtors' ordinary course business operations. The Real Property Lease had no value to the Estates. Nellson Eastern vacated the premises leased under the Real Property Lease

14

prior to the Petition Date, and the landlord was made aware of Nellson Eastern's intent not to further occupy such premises. The Bankruptcy Court entered an order granting the relief requested on February 22, 2007 [Docket No. 118].

The Debtors also filed the following rejection motions: (i) *Debtors' Motion for Order Pursuant to Section 365(a) of the Bankruptcy Code Authorizing the Debtors to Reject Certain Executory Contracts with Minolta Business Solutions* [Docket No. 1224]; and (ii) *Motion for Order Under Section 365(a) of the Bankruptcy Code Authorizing the Debtor to Reject Unexpired Executory Contract with Air Liquide America L.P. and Fixing a Bar Date for Claims of Counterparty to the Rejected Contract* [Docket No. 1686]. Both motions sought to reject contracts where the goods and services were no longer necessary to the Debtors' estates. The Bankruptcy Court granted both of these rejection motions [Docket Nos. 1264 and 1728, respectively].

## 7. Retention of Key Professionals

The Debtors sought to employ and retain the firm of Pachulski Stang Ziehl & Jones LLP as their bankruptcy counsel with regard to the filing and prosecution of their Chapter 11 Cases. An order was entered authorizing that retention, effective as of the Petition Date, on February 22, 2006 [Docket No. 121].

The Debtors also sought employment of XRoads Solutions Group, LLC, to provide restructuring services to the Debtors. The Bankruptcy Court authorized this retention on February 22, 2006 [Docket No. 116]. Similarly, the Debtors sought employment of PricewaterhouseCoopers LLP to provide tax advice services to the Debtors. The Bankruptcy Court authorized this retention on March 21, 2006 [Docket No. 202].

Later in the case, the Debtors sought to employ and retain the firm of Alvarez & Marsal Securities, LLC as financial advisors to the Debtors in connection with the sale of substantially all of the Debtors' assets [Docket No. 1288], as discussed more fully below in Article III.N. On May 23, 2007, the Bankruptcy Court entered the *Order Authorizing the Debtors to Retain Alvarez & Marsal Securities, LLC as Financial Advisor Nunc Pro Tunc To April 30, 2007* [Docket No. 1331]; and on June 8, 2007, the Bankruptcy Court entered the *Amended Order Authorizing the Debtors to Retain Alvarez & Marsal Securities, LLC as Financial Advisor Nunc Pro Tunc To April 30, 2007* [Docket No. 1366]. On October 19, 2007, the Bankruptcy Court entered the *Order Granting Final Application of Alvarez & Marsal Securities, LLC as Financial Advisor to the Debtors and Debtors in Possession for Allowance of Compensation and Reimbursement of Expenses* [Docket No. 1701] allowing on a final basis, $1,598,500.00 as compensation for services and $67,617.15 for reimbursement of expenses, which was paid out of the proceeds of the sale pursuant to the Sale Order, as defined below.

The Debtors also sought the employment of Cross & Simon, LLC as conflicts counsel related to the pursuit of Avoidance Claims. On March 13, 2008, the Bankruptcy Court authorized this retention and entered the *Order Pursuant To 11 U.S.C. §§ 327(A) and 328(A) and Fed. R. Bankr. P. 2014(A), 2016 and 5002 Authorizing the Employment and Retention of Cross & Simon, LLC as Special Litigation Counsel to the Debtors Nunc Pro Tunc* [Docket No. 2049].

15

## 8. Ordinary Course Professionals

On the Petition Date, the Debtors filed their *Motion of the Debtors Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business* [Docket No. 14], without having to file applications for employment and compensation with respect to such professionals. The "Ordinary Course Professionals" consisted primarily of different professional firms that provided, among other things, various ongoing legal and accounting services. On February 22, 2006, the Bankruptcy Court entered its order authorizing the employment of ordinary course professionals using the procedures outlined by the Debtors [Docket No. 117].

## 9. Critical Trade

On the Petition Date, the Debtors filed their *Motion for Order Authorizing the Payment of Prepetition Claims of Critical Trade Vendors* [Docket No. 11], which sought authority for the Debtors to pay, in their sole discretion, up to $2 million to suppliers for ingredients for such products and other materials used in the Debtors' business, which were often supplied by critical vendors who would otherwise be unwilling to do business with a company in bankruptcy.

On January 31, 2006, the Bankruptcy Court entered its order authorizing the payment, up to $2 million, to certain critical vendors, in the Debtors' sole discretion [Docket No. 36].

## 10. Customer Programs

On the Petition Date, the Debtors filed their *Motion for Entry of Order Pursuant to Sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business* [Docket No. 8]. Prior to the Petition Date, and in the ordinary course of business, the Debtors offered and engaged in certain customer and other programs and practices to develop and sustain a positive reputation in the marketplace for their services and to engender customer loyalty (the "Customer Programs"). The Customer Programs ensured customer satisfaction, generated goodwill, and met competitive pressures so that Debtors could retain current customers, attract new ones, and ultimately enhance net revenue.

On January 31, 2006, the Bankruptcy Court entered its order authorizing the Debtors to continue to honor the Customer Programs [Docket No. 32].

## 11. Cash Collateral Use and DIP Financing

The Debtors sought authority to use cash collateral in which the Agent asserts an interest. The Debtors' cash management bank -- Wells Fargo -- also asserted an interest in the Debtors' cash collateral, although the Debtors were not aware of any outstanding debts to Wells Fargo as of the Petition Date.

On the Petition Date, the Debtors filed their *Motion Pursuant to 11 U.S.C. § 105, 361, 362 and 363, Fed. R. Bankr. P. 4001(b) and 9014, and Del. Bankr. LR 4001-2 Authorizing Debtors' Use of Cash Collateral, Providing Adequate Protection Therefor and Scheduling a*

16

*Final Hearing Thereon* [Docket No. 9]. On January 31, 2006, the Bankruptcy Court entered its interim orders [Docket Nos. 33 and 34] which authorized the Debtors' limited use of cash collateral through February 24, 2006 pursuant to the terms of the cash collateral budget and granted certain adequate protection to the Agent and Wells Fargo. On February 22, 2006, the Bankruptcy Court entered its second interim order further extending the use of cash collateral and granting adequate protection to the Agent until March 24, 2006 [Docket No. 120]. The final hearing concerning the use of cash collateral pursuant to the terms of the cash collateral budget, which granted certain adequate protection to the Agent and Wells Fargo was held on March 21, 2006 and final orders were entered that day [Docket No. 207 and 208] (collectively, the "Final Cash Collateral Orders").

On November 28, 2007, upon motion of the Debtors, the Bankruptcy Court entered the *Order Approving Stipulated Amendment to Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code Authorizing the Use of Cash Collateral and Granting Adequate Protection* [Docket No. 1752]. This Order continued the Debtors' authority to use cash collateral with approval of a monthly budget from the Agent and the First Lien Lenders.

## 12.     503(b)(9) Claims and Settlement Procedures

Newly-added section 503(b)(9) of the Bankruptcy Code states:

> (b)  After notice and a hearing, there shall be allowed, administrative expenses, other then claims allowed under section 502(f) of this title, including –
>
> > (9) the value of any goods received by the debtor within 20 days before the date of the commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. § 503(b)(9). The Debtors received at least twelve separate requests for payment of administrative expenses pursuant to section 503(b)(9). On March 31, 2006, in order to streamline the process of handling these requests, the Debtors filed the *Debtors' Motion for Order Authorizing and Approving an Omnibus Procedure for Settling 11 U.S.C. §503(b)(9) Claims* [Docket No. 259]. The Bankruptcy Court entered an order approving the procedures [Docket No. 296], pursuant to which the Debtors settled all claims asserted under section 503(b)(9).

## 13.     Bariatrix Stay Relief Motion

On March 3, 2006, Bariatrix Products International, Inc. and certain affiliated entities (together, "Bariatrix") filed the *Motion to Enforce Arbitration Agreement/Compel Arbitration and for Relief from the Automatic Stay* [Docket No. 170]. Pursuant to this motion, Bariatrix sought authorization from the Bankruptcy Court to proceed with an arbitration proceeding to compel the release of approximately $10 million held in an escrow arising from the Debtors' acquisition of certain assets in Canada. On the same day, the Debtors filed the *Motion of Debtors for Order Under Sections 105(a) and 263(a) of the Bankruptcy Code Extending the*

17

*Automatic Stay to Apply to Nellson Nutraceutical Canada, Inc., in Pending Arbitration Proceeding* [Docket No. 160]. The Debtors sought an order from the Bankruptcy Court staying the entirety of the arbitration commenced by Bariatrix against the Debtors because the escrow fund constituted security for potential indemnity obligations that may be owed by Baritarix to the Debtors. On March 28, 2006, the Bankruptcy Court granted the relief requested by the Debtors pursuant to the *Order Under Section 362(a) of the Bankruptcy Code Enforcing Automatic Stay in Pending Arbitration Proceeding* [Docket No. 247]. The Bankruptcy Court also denied the motion filed by Bariatrix, without prejudice [Docket No. 248].

Subsequently, Bariatrix resolved the sole remaining indemnity claim asserted against the Debtors and the parties agreed to the release of the escrow fund, as reflected by the Debtors' *Motion for an Order Pursuant to Section 362(d) of the Bankruptcy Code and Bankruptcy Rule 4001(d) Approving Stipulation for Relief from Stay and Release of Escrow Fund* [Docket No. 497]. The Bankruptcy Court approved this motion by order dated August 7, 2006 [Docket No. 548].

### 14.  Lease Assumption

On July 21, 2006, the Debtors filed the *Motion for an Order Pursuant to Sections 363 and 365 of the Bankruptcy Code Authorizing Debtors to Assume Certain Non-Residential Real Property Leases* [Docket No. 496]. Under section 365(d)(4) of the Bankruptcy Code, the Debtors' absolute deadline (absent landlord consent) for assuming unexpired leases of non-residential real property was August 27, 2006. Because the Debtors' leases were necessary for the company's ongoing operations, the Debtors determined to assume all of the company's remaining unexpired non-residential real property leases. The Bankruptcy Court approved this motion by order dated August 7, 2006 [Docket No. 547].

### 15.  Exclusivity Extensions

Concurrent with the Valuation Protocol and Valuation Trial (both as defined below), the Debtors requested extensions of the Debtors' exclusive periods in which to file and solicit a plan of reorganization, which were granted by the Bankruptcy Court. The Debtors maintained the exclusive period to propose a plan until March 12, 2007 [Docket No. 1056]. The Debtors allowed the exclusive right to file and solicit a plan to lapse on such date. No other party has yet filed a proposed plan.

### F.  Appointment of Official Committee

On February 9, 2006, at a meeting of the twenty (20) largest unsecured creditors of the Debtors held at the Office of the United States Trustee in Wilmington, Delaware, the United States Trustee appointed the Official Committee as the representative of the Debtors' general unsecured creditor constituency in these Chapter 11 Cases. The Official Committee was composed of Solae, LLC, Kerry Inc., Pride Transport, Inc., The Blommer Chocolate Company, and Printpak, Inc. The Official Committee retained Reed Smith LLP as counsel, FTI Consulting, Inc. as its financial advisors, and Donlin, Recano & Company, Inc. as the Official Committee's information agent in the Chapter 11 Cases.

18

**G.** **Bar Date for Filing Proofs of Claim and Administrative Proofs of Claims**

On February 28, 2006, the Debtors filed a motion requesting that the Bankruptcy Court set a deadline by which parties, including governmental units, must file proofs of claim (the "Bar Date Motion"). The Bar Date Motion was granted by the Bankruptcy Court on March 21, 2006 (the "Bar Date Order") [Docket No. 212], and established May 21, 2006 as the deadline for filing Claims with the Bankruptcy Court for any claims against the Debtors arising prior to the Petition Date (the "General Bar Date") and July 27, 2006 as the Governmental Units Bar Date. A schedule of the filed Proofs of Claims is maintained by the Debtors' claims agent.

On November 28, 2007, the Debtors filed their *Motion of Debtors for an Order (1) Fixing Deadline for Filing Administrative Expense Requests, (2) Approving Form and Manner of Notice Thereof, and (3) Granting Related Relief* [Docket No. 1754], requesting that the Bankruptcy Court establish January 31, 2008 as the Bar Date for all Administrative Expenses arising on or before October 3, 2007. On December 19, 2007, the Bankruptcy Court entered an order granting the relief requested in this motion [Docket No. 1783].[4]

**H.** **Filing of Statements and Schedules**

On February 28, 2006, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court, which set forth, *inter alia*, scheduled prepetition claims against the Debtors based on their books and records.

**I.** **Management Incentive Program**

On April 28, 2006, the Debtors filed their *Motion of the Debtors for Entry of an Order Authorizing and Approving Payments Under Management Incentive Plan* [Docket No. 334] (the "MIP Motion"). Pursuant to the MIP Motion, Debtors proposed to pay nine of their key managers a maximum aggregate of $1.4 million if (a) the Debtors hit their budgeted EBITDA targets ("Budgeted EBITDA"), or (b) upon the occurrence of certain unlikely events that would make it extremely difficult (or impossible) to achieve Budgeted EBITDA. The Official Committee and United States Trustee objected to the MIP Motion and the Bankruptcy Court held an evidentiary trial on the MIP Motion on July 10 and 13, 2006.

On July 18, 2006, the Bankruptcy Court entered its *Order Authorizing and Approving Payments Under Management Incentive Plan* granting the relief requested in the MIP Motion [Docket No. 482] (the "MIP Order").

On July 27, 2006 and July 28 2006, the United States Trustee and the Official Committee, respectively, filed Notices of Appeal of the MIP Order [Docket Nos. 512 and 518] (collectively, the "MIP Appeals"). The MIP Appeals are currently pending before the United States District Court for the District of Delaware ("District Court") [Dist. Ct. Civ. Case Nos. 06-520 and 06-521]. On June 26, 2007, the Debtors filed their motion and *Brief in Support of Appellees' Motion to Dismiss Appeal on Mootness Grounds* [Dist. Ct. Docket No. 5], which is

---

[4] On April 24, 2008, the Bankruptcy Court entered the *Order Approving Second Stipulation Extending Bar Date for Certain Parties to File Administrative Expense Requests* [Docket No. 2108], which extended the Administrative Expense Bar Date for certain lenders until September 29, 2008.

currently pending before the District Court. Under the Plan, the Official Committee shall withdraw from the pending appeal of the MIP Order with prejudice. The United States Trustee, however, is still pursuing this appeal.

## J.    **Appointment of Examiner**

On October 10, 2006, the United States Trustee filed the *Motion of the United States Trustee for Entry of an Order Appointing a Chapter 11 Trustee* [Docket No. 716], which the Agent [Docket No. 748] and the Official Committee [Docket No. 752] joined. On November 30, 2006, and in response to a partial settlement on this motion, the Bankruptcy Court entered an order directing the United States Trustee to appoint an examiner [Docket No. 855] to investigate communications between the Debtors and the members of the Official Committee during the Valuation Trial (discussed below) regarding ongoing and future business relationships.

On January 11, 2007, the United States Trustee appointed Michael Luskin as examiner [Docket No. 981] which the Bankruptcy Court approved on January 23, 2007 [Docket No. 1010]. Mr. Luskin retained his law firm, Luskin, Stern & Eisler LLP, as counsel to assist with the examination, which was approved by the Bankruptcy Court [Docket No. 1067]. On November 8, 2007, Mr. Luskin issued his report on the examination and found no wrongdoing on behalf of the Debtors and made no recommendations to the Bankruptcy Court regarding the need to take any additional action [Docket No. 1731].

## K.    **Valuation Litigation**

On April 28, 2006, the Debtors filed the *Motion of Debtors to Determine: (1) Enterprise Value of Debtors, and (2) Secured Claims of Prepetition Secured Lenders Pursuant to Section 506(a) of the Bankruptcy Code; Notice of Status Conference and Request that Court Enter Proposed Scheduling and Procedures Order in Respect Thereon* [Docket No. 333].

On May 26, 2006, the Bankruptcy Court entered its *Revised Order Establishing Dates Regarding Valuation Hearing Related to the Debtors' Enterprise Value Pursuant to Bankruptcy Code Section 506(a)*, entered May 26, 2006 [Docket No. 383] (the "Valuation Protocol"). Pursuant to the Valuation Protocol, the Debtors, the Agent, the Official Committee and the Informal Committee conducted extensive discovery, including the depositions of numerous fact and expert witnesses. The Debtors produced approximately 65,000 pages of documents to the other parties in the dispute.

The Bankruptcy Court commenced a trial (the "Valuation Trial") on September 13, 2006, and ultimately consumed approximately 21 trial days through December 2006. The Valuation Trial included testimony from various fact and expert witnesses. During the course of the Valuation Trial, the Bankruptcy Court also considered and ruled upon a number of trial motions.

The experts involved in the Valuation Trial consisted of: (a) for the Debtors, James W. Harris of Seneca Financial Group, Inc. ("Seneca"); (b) for the Agent, Russell Belinsky of Chanin Capital LLC ("Chanin"); (c) for the Informal Committee, William "Tuck" Hardie of Houlihan Lokey Howard & Zukin ("HLHZ"); and (d) for the Official Committee, Richard S. Braun of FTI Consulting, Inc. ("FTI", and collectively with Chanin and HLHZ, the "Creditor Experts"). The Bankruptcy Court excluded the expert testimony of Seneca with regard to Nellson's enterprise

value, but admitted Seneca's rebuttal to the valuations prepared by the Creditor Experts. See *Order* and *Memorandum Opinion* dated November 29, 2006 [Docket Nos. 852-854].

The Creditor Experts ultimately reached the following conclusions in terms of valuing the Debtors' enterprise:

| Valuation Expert | Valuation Range ($000,000) | Median Value ($000,000) |
|---|---|---|
| FTI | None | $349.0 |
| Chanin | $296.1-$333.1 | $314.4 |
| HLHZ | $301.0-$343.0 | $322.0 |

The Agent and the Official Committee also challenged the credibility of the Debtors' five-year long range business plan, which underlied certain aspects of the experts' valuations.

As mentioned above, on January 18, 2007, the Bankruptcy Court issued its *Order* and *Findings of Fact and Conclusions of Law* [Docket Nos. 992 and 993], collectively referred to herein as the "Valuation Order." Pursuant to the Valuation Order, the Bankruptcy Court ruled that the Debtors' enterprise value, as of December 31, 2006, was $320 million.[5]

## L. Proposed Settlement with Fremont and the Agent, on Behalf of the Second Lien Lenders

On January 25, 2007, the Debtors filed their *Motion for Order Approving Compromise and Settlement Agreement with Fremont Investors VII, LLC and the Second Lien Lenders* (the "Second Lien Settlement Motion"). The motion sought approval of that certain Settlement Agreement dated as of January 17, 2007, between the Debtors, Fremont, the Agent, and a steering committee of Lenders (the "Second Lien Settlement Agreement").

Pursuant to the Second Lien Settlement Agreement, the Agent and Fremont agreed to support a plan of reorganization that would extinguish all existing equity interests in Nellson Holdings, but provided for the distribution to Fremont of two percent (2%) of the equity of the reorganized company under a plan. Upon the effective date of the proposed settlement, all current directors on the Debtors' boards would resign and Fremont and the Debtors would stipulate to the appointment of a chief restructuring officer, who shall be satisfactory to the Agent. The Second Lien Settlement Agreement also contained mutual releases amongst the parties, excluding obligations arising under the agreement.

The First Lien Lenders objected to the Second Lien Settlement Motion. At the conclusion of a contested hearing on March 12, 2007, the Bankruptcy Court denied the Second Lien Settlement Motion [Docket No. 1184]. Nevertheless, the Debtors appointed Duff Meyercord to the board of directors to add an additional independent director -- one of the remedies that the Agent sought in the settlement that was not approved.

---

[5] On January 26, 2007, the Debtors filed the *Debtors' Motion for Reconsideration in Respect of Certain Findings of Fact and Conclusions of Law Relating to the Debtors' Enterprise Value* [Docket No. 1020], which was subsequently withdrawn on February 5, 2008 [Docket No. 2013]. On January 29, 2007, the First Lien Lenders filed a *Notice of Appeal* regarding the Valuation Opinion [Docket No. 1021], which was subsequently withdrawn on February 13, 2008 [Docket No. 2020].

M.    **Ordinary Course Bonus Motion**

On March 30, 2007, the Debtors filed a motion seeking a precautionary order approving a modification to the Debtors' ordinary course employee bonus compensation program for calendar year 2006 [Docket No. 1222]. In conjunction with this motion, the Debtors sought the employment of Johnson Associates, Inc. as compensation advisor related to the relief requested in the motion. The Bankruptcy Court approved this requested retention [Docket No. 1265].

On April 24, 2007, the Bankruptcy Court entered the *Order Approving in Part and Reserving in Part Decision Upon Debtors' Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees* [Docket No. 1269]. On May 24, 2007, the Bankruptcy Court entered its *Opinion* [Docket No. 1339] whereby the Bankruptcy Court issued its findings of fact and conclusions of law related to the motion. On May 24, 2007, the Bankruptcy Court entered the *Second Order Granting Debtors' Precautionary Motion for Order Approving Modification to Ordinary Course Bonus Compensation Program for Employees* [Docket No. 1342].

N.    **Sale of Substantially All of the Debtors' Assets**

After the Second Lien Settlement Motion was denied (as addressed above), the Agent and the First Lien Lenders determined that value would be maximized by immediately selling the Debtors' operating business and urged the Debtors to commence a process for the sale of substantially all of the Debtors' operating assets. The Debtors considered and agreed with this request, and subsequently ran and devoted significant resources to a sale process.

On August 24, 2007, the Bankruptcy Court entered that certain *Order (i) Approving Sale of Substantially All of the Debtors' Operating Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code; (ii) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (iii) Granting Related Relief* (the "Sale Order") [Docket No. 1587]. The Sale Order approved the sale of substantially all of the Debtors' operating assets (the "Sale") to Nellson Acquisition Co., LLC (the "Purchaser"). The Purchaser was an entity owned and funded by various holders of first lien secured debt (some of whom are also members of the Informal Committee). Specifically, the Purchaser's principals controlled approximately 52.3% of the First Lien Lender Claims. The Purchaser's winning bid was comprised of cash and a credit component, which in the aggregate totaled approximately $122 million, plus assumed liabilities,[6] subject to a working capital adjustment. The Sale to Purchaser closed on October 3, 2007 (the "Closing Date").

Out of the total proceeds from the Sale, the sum of $4.5 million was withheld from the Debtors as a deposit and remains in escrow, subject to the working capital adjustment and a final determination of the purchase price (the "Remaining Deposit"). A separate escrow containing $1.5 million in sales proceeds also remains in place to cover any potential Canadian tax claims that may arise out of the Sale (the "Canadian Tax Escrow"). The Canadian Tax Escrow will remain in place until released by Canadian taxing authorities.

---

[6]  Assumed liabilities included the following: (a) cure costs ($50,000); (b) ordinary course postpetition trade payables ($11 million); (c) ordinary course postpetition trade accruals ($5 million), and (d) a prepetition priority tax claim asserted by the Internal Revenue Service ($7.3 million).

22

**O.      Partial Payment to "Non-Participating" First Lien Lenders**

On September 10, 2007, the Debtors filed that certain *Motion of Debtors For an Order Authorizing Distribution of Certain Sale Proceeds to Certain Lenders Consistent with Court's Order Authorizing Sale of Substantially All of the Debtors' Operating Assets* [Docket No. 1624] seeking an order authorizing the Debtors to distribute up to $50.6 million of sale proceeds to the Agent on account of the First Lien Lender Claims, but solely for the benefit of those First Lien Lenders who did not participate ("Non-Participating First Lien Lenders") in the purchase of the Debtors' assets. The Bankruptcy Court entered an order allowing such distribution October 3, 2007 [Docket No. 1684], and on the same day, approximately $50.6 million was distributed to the First Lien Lenders in partial satisfaction of the Non-Participating First Lien Lenders' Claims.

**P.      Preference Actions**

On January 24 and 25, 2008, the Debtors filed over 160 Avoidance Claims seeking the recovery of preferential transfers. Attached hereto as Exhibit 3 is a chart reflecting all the pending Avoidance Claims. The Debtors filed these actions in order to preserve the Estates' rights in light of the limitations deadline of January 28, 2008, pursuant to section 546(a)(1) of the Bankruptcy Code.

To date, the Preference Actions have not been served on the various defendants. On April 29, 2008, the Bankruptcy Court entered its *Order Authorizing the Debtors' Motion to Extend Time Limit for Service of Process* [Docket No. 2115], which extends the time for the Debtors to serve the complaints in the pending Avoidance Claims until September 22, 2008.

**IV.**

**ESTATE ASSETS AND PROJECTED CREDITOR RECOVERIES**

**A.      Estate Assets**

The current assets of the Debtors' Estates consist primarily of: (a) cash in the amount of approximately $22,336,850 (as of June 1, 2008);[7] (b) a patent infringement action styled *Nellson Northern Operating Inc. and Nellson Nutraceutical, Inc.  v. Elan Nutrition, LLC, et al.*, pending in the United States District Court for the District of Vermont, Civil Action Docket No. 02-CV-304 (the "Elan Litigation"), as discussed more fully below; and (c) potential litigation and settlement recoveries from Avoidance Claims (against third parties that received payments from the Debtors during the 90-days prior to the Petition Date).

A listing of the Debtors' pending Avoidance Claims is annexed hereto as Exhibit 3.

---

[7]  This amount excludes funds held on retainer by Debtors' counsel and anticipated cash receipts from the Remaining Deposit and the Canadian Tax Escrow.

## B.    The Elan Litigation

The Elan Litigation was filed by a predecessor company of Nellson Northern and NNI (together, the "Nellson Plaintiffs") on or about November 13, 2002 and is pending in the United States District Court for the District of Vermont. The Nellson Plaintiffs joined the suit after acquisition of the predecessor company. The case has been assigned to Chief Judge William Sessions and will be tried to a jury.

The two patents in suit, U.S. Patent Nos. 6,299,929 and 6,749,886, were issued in 2001 and 2004, respectively, and cover high protein nutritional bars -- bars that contain more protein than carbohydrates and meet additional limitations of the asserted claims. The technical expert of the Nellson Plaintiffs has identified more than 150 types of bars manufactured by defendant Elan Nutrition, Inc. of Grand Rapids, Michigan that infringe the patents-in-suit.

The Nellson Plaintiffs' damages expert has opined that the Nellson Plaintiffs have lost profits of over $19.8 million as a result of Elan's infringement, which the Nellson Plaintiffs are seeking in damages. In the alternative, the Nellson Plaintiffs are seeking over $9 million in reasonable royalties. The Nellson Plaintiffs have also alleged that Elan's infringement is willful and, as a result, are also seeking to double or triple their compensatory damages. The damages period extends from October 9, 2001 to October 3, 2007, when the patents in suit were assigned to the "Purchaser.

Elan denies infringement and contends that the patents in suit are invalid. Elan also contends that the patents are unenforceable based on the Nellson Plaintiffs' alleged misrepresentations to the U.S. Patent Office. Elan also claims that the Nellson Plaintiffs violated federal antitrust laws by attempting to enforce patents allegedly procured by misrepresentations to the U.S. Patent Office. It has also challenged the amount of damages calculated by the Nellson Plaintiffs' expert and challenges the right of NNI to recover damages as a de facto exclusive licensee of the patents-in-suit.

On January 17, 2008, Elan filed a motion to dismiss or alternatively for summary judgment arguing that after the assignment of the patents in suit to the Purchaser, the current Nellson Plaintiffs lack standing to continue to prosecute the case without the Purchaser joining the case. Elan also contends that the Nellson Plaintiffs do not have the right to sue for past damages. The motion has been fully briefed and is awaiting oral argument.

Factual discovery in the case is almost complete, expert reports have been exchanged and remaining expert depositions should be scheduled in the near future. After the expert depositions have been completed, both parties intend to make dispositive motions.

The outcome of the Elan Litigation and its value to the Debtors' Estates is uncertain at this time.

24

## C. Projected Creditor Recoveries

Under the Plan, consistent with the terms of a global settlement agreement amongst the Debtors and their principal creditor constituents and equity holders, the Debtors' First Lien Lenders will receive most of the remaining assets in the Estates in the form of Cash distributions.

As noted above, the First Lien Lenders previously received distributions in the form of either Cash or credit in connection with a successful bid to acquire the Debtors' operating assets, equivalent to a distribution of approximately 41.6% on account of the $255 million principal amount of the First Lien Lender Claims as of the Petition Date. Under the Plan, the Debtors project that the First Lien Lenders will receive an additional 6.0% on account of their Claims or approximately $17.8 million in Cash. Further recoveries are possible depending on the outcome of the Elan Litigation.

The Second Lien Lenders will receive $2 million in Cash under the Plan, which is equivalent to approximately 2.7% of the $75 million principal amount of the Second Lien Lender Claims as of the Petition Date.

Administrative and priority claims will be paid in full under the Plan, including nearly $2.5 million in cash for various professionals employed by the Lenders.

Holders of General Unsecured Claims are released of any potential Avoidance Claims, but receive no other distributions under the Plan.

Finally, as part of a global settlement incorporated in the Plan, Holders of Subordinated Debt Claims, and each of the Debtors' Executives, shall have the opportunity to enter into certain releases. Holders of Subordinated Debt Claims and Executives shall receive no other distributions under the Plan. All Interests in the Debtors shall be cancelled.

A more detailed outline of the Debtors' projections for creditor recoveries, and sources and uses of Cash, under the Plan is annexed hereto as Exhibit 4. The projected recoveries under the Plan set forth herein assume an Effective Date of September 15, 2008.

## V.

## DESCRIPTION OF THE PLAN

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN ARTICLES VI THROUGH XVIII BELOW. THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN OF LIQUIDATION. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL. ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

# VI.

## GLOBAL SETTLEMENT AND RELEASES INCORPORATED IN THE PLAN

The Plan effectuates a global settlement and release of claims amongst the Debtors and their various creditor constituents, equity holders and officers and directors (the "Settlement"). The Settlement lays the framework for the distributions and releases set forth in the Plan, and is the result of arms length, good faith negotiations between the Debtors, the Agent, the Informal Committee, the Official Committee, and Fremont.

### A.    Description of the Settlement

The Settlement involves several key components, which are summarized below:

1.    The Lenders shall have an Allowed Superpriority Claim in the amount of $100 million.

2.    In full satisfaction of all rights, disputes and claims, the First Lien Lenders shall receive their Pro Rata share of all the remaining assets in the Estates, minus certain cash set aside for Second Lien Lenders, various professionals employed by the Lenders, and administrative expenses and priority claims.

3.    In full satisfaction of all rights, disputes and claims, the Second Lien Lenders shall receive their Pro Rata share of $2.0 million in cash currently held by the Estates.

4.    Each Lender shall be released of any Rights of Action held by the Debtors, their Estates, the Official Committee and its members (acting in such capacity), and upon execution of certain releases, will also be released of any rights or claims of the Agent, the Holders of Subordinated Debt Claims, and Executives.

5.    Holders of General Unsecured Claims shall receive no distributions or recoveries under the Plan, but will benefit from the general release of any Avoidance Claims held by the Debtors and their Estates.

6.    In full satisfaction of all rights, disputes and claims, Holders of the Subordinated Debt Claims (i.e., Fremont) shall have the opportunity to execute a Subordinated Debt Holder Release and, upon execution thereof, shall be released of any Rights of Action held by the Debtors, their Estates, the Agent upon execution of the Agent Release, the Lenders that execute the Lender Release, the Official Committee, and its members (acting in such capacity). Holders of the Subordinated Debt Claims shall receive no other distributions or recoveries under the Plan.

7.    All Indemnification Claims of Executives shall be disallowed. Each Executive shall also have the opportunity to execute an Executive Release and, upon execution thereof, shall be deemed released of any Rights of Action held by the Debtors, their Estates, the Agent, the Lenders that execute the Lender Release, the Holders of Subordinated Debt Claims upon execution of the Subordinated Debt Holder Release, the Informal Committee and the Official Committee. Executives shall receive no other distributions or recoveries under the Plan, but shall preserve any and all rights against any available insurance coverage.

26

8.   All Intercompany Claims and Equity Interests shall be extinguished.

The foregoing Settlement is incorporated in the Plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. Further, the Plan shall be construed as a motion under Bankruptcy Rule 9019 for approval of the Settlement.

From the perspective of the Estates, the Settlement contemplates only three things: (1) a release of any rights or claims against the Agent and the Lenders; and (2) a release of any rights or claims against the Holders of the Subordinated Debt Claims (i.e., Fremont) and Executives, provided that such parties execute certain releases; and (3) a release of Avoidance Actions and Intercompany Claims (together, the "Estate Releases").

## B.   Applicable Legal Standard

Approval of the Settlement as part of the Plan is generally governed by four factors: (i) the probability of success in litigation; (ii) the likely difficulties of collection; (iii) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors.

Although not directly on point under the circumstances of these Chapter 11 Cases, the Debtors submit that each of these factors is satisfied with respect to the Settlement. As an initial matter, the Debtors believe that the Settlement, and the Estate Releases contemplated thereunder, are reasonable and in the best interests of the Estates by resolving long-standing disputes amongst the Debtors and their creditor constituents and equity holders. The Settlement also allows for a prompt and efficient distribution of the remaining assets in the Estates to creditors and wind-up of the Debtors' affairs pursuant to the terms of the Plan.

## C.   The Estate Releases Should Be Approved

The Estate Releases are justified because (a) they will facilitate the Debtors' reorganization as an essential part of a compromise and settlement that resolves multiple issues and disputes, (b) they are supported by the creditors who stand to benefit from any claims that are being released, and (c) perhaps most fundamentally, the Debtors are unaware of any meritorious Estate claims that they are giving up against the Agent, the Lenders, the Holders of the Subordinated Debt Claims, and/or the Executives.

The Debtors do not believe that the Estates have any viable claims against the Agent, any of the Lenders, Fremont or any Holder of a Subordinated Debt Claim, or any of the Executives. (Notably, the Estate Releases in favor of the Holders of the Subordinated Debt Claims and Executives would only become effective upon execution of certain releases by such parties in favor of the Estates.) The only possible prepetition claims that have been articulated against the Lenders, Fremont or any Executive relate to the possibility that a dividend recapitalization transaction involving Fremont in 2004 may have been a fraudulent transfer. The Debtors, however, investigated this claim and concluded that there was no merit to it because, among other reasons, the Debtors were not insolvent at the time of the transaction. The statute of limitations on any fraudulent transfer claims has since expired.

27

The Debtors have also considered whether the Estates have any postpetition claims against Fremont based on the Bankruptcy Court's Valuation Order and the statements about Fremont contained therein, which included a statement that Fremont manipulated the Debtors' valuation efforts during the bankruptcy case. The Debtors do not believe that there are any viable postpetition claims to pursue against Fremont.

Notwithstanding the Debtors' belief that the Estates have no valuable claims to release against the Agent, the Lenders, the Holders of the Subordinated Debt Claims or any Executive, the Estate releases in the Plan are supported by material consideration. The Agent and the Lenders are allowing their cash collateral to be used for the purpose of funding the Estates' administrative expenses and priority claims, and the reorganization efforts encompassed in the Plan. At the same time, the Holders of the Subordinated Debt Claims -- namely, Fremont -- are agreeing to release in excess of $40 million in unsecured debt owed by Nellson Holdings, an entity which has no significant debt other than to Fremont and which might have valuable assets. Fremont is also allowing Nellson Holdings to waive intercompany claims against the other Debtors that could total millions of dollars (some of which may be entitled to administrative status). Finally, the Executives under the Plan will be forfeiting their contingent, unliquidated prepetition and administrative claims against the Debtors for indemnity and contribution.

Taken together, the Debtors believe that the Estate Releases in favor of the Agent, the Lenders, the Holders of Subordinated Debt Claims and Executives are warranted by virtue of the lack of any known viable claims to assert, the substantial consideration offered in return for such releases, and the overarching benefits to the Estates associated with confirmation of the Plan.

The Debtors also believe that the contemplated Estate Release of any Avoidance Claims under the Plan is in the best interests of the Estates. In order to preserve the Estates' rights as to certain viable Avoidance Claims, the Debtors have filed various lawsuits seeking to recover preferential transfers. (These claims are specifically identified in Exhibit 3 hereto). The Debtors estimate that such pending Avoidance Claims could have significant value. The primary beneficiaries of these Avoidance Claims are the Lenders on account of their Allowed Superpriority Claims. Many of the targets of the pending Avoidance Claims are Holders of General Unsecured Claims. The Agent, on behalf of the Lenders, the Informal Committee, and the Official Committee have agreed as part of the Settlement to release the pending Avoidance Claims asserted by the Estates. Given that the Lenders have the foremost economic interest in the pending Avoidance Claims and the release of such claims benefits unsecured creditors and is necessary to effectuate the Settlement and the Plan, the Debtors support the contemplated release of all remaining Avoidance Claims and believe that such release is in the best interests of the Estates.

The proposed Settlement Agreement and the Estate Releases are also justified under the remaining factors relevant to approval of a compromise in bankruptcy. If approved, the Settlement will finally resolve contentious, costly, and long-standing litigation between the Debtors, the Agent, the Lenders, the Informal Committee, the Official Committee, and Fremont. Further, the pending claims of the Debtors' various current and former Executives can be addressed in a consensual manner.

28

In sum, the Debtors submit that the Settlement allows the parties with the most at stake to maximize value and represents a positive resolution of these Chapter 11 Cases that is supported by the paramount interests of creditors, and should be approved by the Bankruptcy Court.

## VII.

## TREATMENT OF ADMINISTRATIVE EXPENSES AND TAX CLAIMS

### A.    Introduction

As required by the Bankruptcy Code, Administrative Expenses, Superpriority Claims and Tax Claims are not placed into voting Classes. Instead, they are left unclassified, are not considered Impaired, do not vote on the Plan, and receive treatment specified by statute or agreement of the parties. All postpetition payments by or on behalf of any of the Debtors in respect of an Administrative Expense or Tax Claim shall either reduce the Allowed amount thereof or reduce the amount to be paid under the Plan in respect of any Allowed amount thereof; and, unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtors or the Liquidating Debtors shall, in their sole and absolute discretion, determine which such method of application to employ.

### B.    Administrative Expenses

Under the Plan, on the Effective Date, each Holder of an Allowed Administrative Expense will receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Administrative Expense, Cash equal to the full amount of such Allowed Administrative Expense, unless such Holder and any of the Debtors have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that (a) requests for payment of all Administrative Expenses must be filed and served as described in Article XIV(B)(3) of the Plan, and (b) certain different and additional requirements shall apply to the Administrative Expenses of professionals and certain other Persons requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code as set forth in Article XIV(B)(3) and (4) of the Plan.

### C.    Superpriority Claims

Under the Plan, the Superpriority Claims granted to the Lenders pursuant to the Final Cash Collateral Order are Allowed in the amount of $100 million with respect to the First Lien Lenders; provided that (a) no distribution to the First Lien Lenders shall be made on account of such Allowed Superpriority Claims except as set forth in Article IV(B)(3) of the Plan; and (b) any Superpriority Claims held by the Second Lien Lenders shall be subordinated to the Superpriority Claims held by the First Lien Lenders in accordance with the Final Cash Collateral Order and no distribution to the Second Lien Lenders shall be made on account thereof except as set forth in Article IV(B)(4) of the Plan.

## D.    Payments to Lenders' Professionals

Under the Plan, the Claims of Houlihan, General Electric Capital Corporation ("GE"), Barclays Bank PLC ("Barclays") and certain funds and/or accounts managed or advised by CypressTree Investment Management, Inc. ("CypressTree") for reimbursement of fees and expenses incurred in connection with Houlihan's representation of the Informal Committee shall be Allowed in the aggregate amount of $2.0 million. On the Effective Date, the Debtors shall pay Houlihan such portion of the $2.0 million in Cash as is necessary to pay amounts due and owing to Houlihan but not heretofore paid to Houlihan by GE, Barclays and CypressTree. None of such fees and expenses of Houlihan shall be subject to the approval of the Bankruptcy Court, and Houlihan shall not be required to file with respect thereto any interim or final fee application with the Bankruptcy Court. The remainder of such $2.0 million that is not paid directly to Houlihan shall be remitted to GE, Barclays and Cypress Tree in partial reimbursement of the amounts heretofore paid by them to Houlihan and in such amounts as directed by the Informal Committee in its sole discretion.

In addition, on or as soon as practicable after the Effective Date, the Debtors shall pay (i) the outstanding fees and expenses of the professionals retained by the Agent; (ii) the outstanding fees and expenses of the attorneys retained by the Informal Committee; (iii) the sum of $400,000 in Cash to Highland for reimbursement of attorneys' fees incurred in the Chapter 11 Cases; and (iv) the sum of $60,000 in Cash to New York Life Insurance Company for reimbursement of attorneys' fees incurred in the Chapter 11 Cases. None of the foregoing fees and expenses of the Lenders' professionals shall be subject to the approval of the Bankruptcy Court, and no interim or final fee applications shall need to be filed with the Bankruptcy Court with respect to such fees and expenses.

## E.    Tax Claims

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against any of the Debtors will receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Allowed Tax Claim, Cash equal to the portion of the Allowed Tax Claim due and payable on or prior to the Effective Date according to applicable non-bankruptcy law. Any Allowed Tax Claim (or portion thereof) against any of the Debtors not yet due and payable as of the Effective Date will be paid by the Debtors no later than when due and payable under applicable non-bankruptcy law without regard to the commencement of the Chapter 11 Cases; provided that (1) any default prior to the Effective Date with respect to Tax Claims against any of the Debtors shall be deemed cured and (2) upon request of any of the Debtors, the Bankruptcy Court shall determine the amount of any Disputed Claim for, or issues pertaining to, Tax Claims. Any Holder of a Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

## VIII.

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### A.    Summary

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of seven (7) Classes of Claims and/or Interests. Administrative Expenses and Tax Claims have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

### B.    Classification and Treatment of Claims and Interests

The treatment of each Class of Claims and/or Interests is set forth below. Unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtors shall, in their sole and absolute discretion, determine whether a postpetition payment by or on behalf of any of the Debtors in respect of a Claim either (x) shall reduce the Allowed amount thereof or (y) shall reduce the amount to be paid under the Plan in respect of any Allowed amount thereof.

#### 1.    Class 1 – Priority Non-Tax Claims

Classification: Class 1 consists of all Priority Non-Tax Claims against any of the Debtors, specifically identified as follows.

Treatment: At the election of the Debtors, the Holder of each Priority Non-Tax Claim shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Priority Non-Tax Claim, a Cash payment equal to the Allowed amount of such Claim (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim; or (b) in accordance with the terms and conditions of agreements that either have been or may be approved by the Bankruptcy Court between the Holders of such Claims and any of the Debtors, as the case may be. Any Holder of a Priority Non-Tax Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

Impairment/Voting: Class 1 is Unimpaired. Class 1 therefore is conclusively presumed to have accepted the Plan and Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

31

## 2. Class 2 – Other Secured Claims

Classification: Class 2 consists of all Other Secured Claims (if any such Claims exist).

Treatment: On or as soon as practicable after the Effective Date, at the election of the Debtors and in full satisfaction, settlement, release, extinguishment, and discharge of such Other Secured Claim, each Holder of an Allowed Other Secured Claim shall, on account of such Claim, either: (i) be paid in Cash in full, (ii) have surrendered to such Holder, without representation or warranty, the collateral securing its Claim, (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of such Other Secured Claim to demand or receive accelerated payment of such Claim after the occurrence of a default (A) be paid a cure of any such default that occurred prior to the Effective Date, other than a default of a kind specified in section 365(b)(2) of this title, (B) have reinstated the maturity of such Other Secured Claim as such maturity existed before such default, (C) be compensated for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, and (D) otherwise not have altered the legal, equitable, or contractual rights to which such Other Secured Claim entitles the Holder of such Claim, or (iv) have left unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim. In the case of option (ii) or (iii), in the event that any such Other Secured Claim is not completely satisfied by such distribution, any deficiency against the Debtors will be treated as a General Unsecured Claim. Any Holder of an Other Secured Claim may agree to accept different treatment as to which the Debtors and such Holder have agreed upon in writing.

Impairment/Voting: Class 2 is Unimpaired. Class 2 is therefore conclusively presumed to have accepted the Plan, and Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

## 3. Class 3 – First Lien Lender Claims

Classification: Class 3 consists of the First Lien Lender Claims against any of the Debtors.

Treatment: On or as soon as practicable after the Effective Date or such other date as First Lien Distributable Assets become available for distribution, each First Lien Lender shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such First Lien Lender Claim, the following: (i) a Pro Rata share (calculated as a percentage of First Lien Lender Claims) of the First Lien Distributable Assets to be distributed to the Agent under the Plan and distributed by the Agent to the First Lien Lenders in accordance with the First Lien Credit Agreement; (ii) a release of any Rights of Action held by the Debtors, their Estates, and the Official Committee and its members (acting in such capacity); and (iii) only as to those First Lien Lenders that execute the Lender Release, a release of any Rights of Action held by the Agent upon execution of the Agent Release, the Executives that execute the Executive Release, and the Holders of Subordinated Debt Claims who execute the Subordinated Debt Holder Release. All distributions to the First Lien Lenders under the Plan shall be effectuated through the Agent (i.e., the Debtors or the Liquidating Debtors shall distribute Cash to the Agent and the Agent shall make distributions to the First Lien Lenders). The existing Liens securing the First

32

Lien Lender Claims will be retained subject to the terms of the Plan and the distributions contemplated by the Plan. The First Lien Lender Claims are deemed Allowed in the full amount reflected on the Agent's books and records as of the Record Date.

Impairment/Voting: Class 3 is Impaired. Holders of Class 3 are therefore entitled to vote to accept or reject the Plan.

## 4. Class 4 – Second Lien Lender Claims

Classification: Class 4 consists of the Second Lien Lender Claims against any of the Debtors.

Treatment: On or as soon as practicable after the Effective Date, each Second Lien Lender shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Second Lien Lender Claim, the following: (i) a Pro Rata share (calculated as a percentage of Second Lien Lender Claims as of the Record Date) of $2.0 million in Cash to be distributed to the Agent under the Plan and distributed by the Agent to the Second Lien Lenders in accordance with the Second Lien Credit Agreement; (ii) a release of any Rights of Action held by the Debtors, their Estates, and the Official Committee and its members (acting in such capacity); and (iii) only as to those Second Lien Lenders that execute the Lender Release, a release of any Rights of Action held by the Agent upon execution of the Agent Release, the Executives that execute the Executive Release, and the Holders of Subordinated Debt Claims who execute the Subordinated Debt Holder Release. All distributions to the Second Lien Lenders under the Plan shall be effectuated through the Agent (i.e., the Debtors shall distribute Cash to the Agent and the Agent shall make distributions to the Second Lien Lenders). The existing Liens securing the Second Lien Lender Claims shall be extinguished upon such Cash payment. The Second Lien Lender Claims are deemed Allowed in the full amount reflected on the Agent's books and records as of the Record Date.

Impairment/Voting: Class 4 is Impaired. Holders of Class 4 are therefore entitled to vote to accept or reject the Plan.

## 5. Class 5 – General Unsecured Claims

Classification: Class 5 consists of the General Unsecured Claims against any of the Debtors.

Treatment: Holders of General Unsecured Claims against the Debtors shall receive no distributions or recoveries on account of such Claims and such Claims shall be extinguished on the Effective Date. However, Holders of General Unsecured Claims shall benefit from the Debtors' general release of Avoidance Claims set forth in Article X(D) of the Plan.

Impairment/Voting: Class 5 is Impaired. Because Holders of Interests in Class 5 receive no recovery on account of such Claims under the Plan, they are conclusively presumed to reject the Plan.

33

6. **Class 6 – Subordinated Debt Claims**

   Classification:  Class 6 consists of the Subordinated Debt Claims.

   Treatment:  On the Effective Date, in full satisfaction, settlement, release, extinguishment, and discharge of (a) all rights of Holders of Subordinated Debt Claims against Nellson Holdings, including but not limited to any rights of Nellson Holdings to assert Intercompany Claims, and (b) all Claims and Administrative Expenses asserted by the Holders of the Subordinated Debt Claims in any capacity against any of the Debtors, each Holder of a Subordinated Debt Claim that executes the Subordinated Debt Holder Release shall be released of any Rights of Action held by the Debtors, their Estates, the Agent upon execution of the Agent Release, the Lenders that execute the Lender Release, the Executives that execute the Executive Release, the Informal Committee and its members (acting in such capacity), and the Official Committee and its members (acting in such capacity).  Except as set forth in the foregoing sentence, Holders of Subordinated Debt Claims shall receive no distributions or recoveries on account of such Claims.

   Impairment/Voting:  Class 6 is Impaired.  Holders of Class 6 are therefore entitled to vote to accept or reject the Plan.

7. **Class 7 – Interests in the Debtors**

   Classification:  Class 7 consists of Interests in the Debtors.

   Treatment:  Holders of Interests in the Debtors shall receive no distributions or recoveries on account of such Interests and such Interests shall be extinguished on the Effective Date.

   Impairment/Voting:  Class 7 is Impaired.  Because Holders of Interests in Class 7 receive no recovery on account of such Interests under the Plan, they are conclusively presumed to reject the Plan.

## IX.

## ACCEPTANCE OR REJECTION OF PLAN

A. **Identification of Unimpaired Classes**

The following Classes are not Impaired (i.e., are Unimpaired) under the Plan:

   1. Class 1  – Priority Non-Tax Claims

   2. Class 2 – Other Secured Claims

B. **Identification of Impaired Classes**

The following Classes of Claims and Interests are Impaired under the Plan.

34

1. Class 3 – First Lien Lender Claims

2. Class 4 – Second Lien Lender Claims

3. Class 5– General Unsecured Claims

4. Class 6 – Subordinated Debt Claims

5. Class 7 – Interests in the Debtors

## C.    Classes Permitted and Not Permitted to Vote

Classes 1 and 2 are Unimpaired. Holders of Claims or Interests in such Classes are conclusively presumed pursuant to section 1126(f) of the Bankruptcy Code to have accepted the Plan and therefore shall not be entitled to vote to accept or reject the Plan.

Classes 3 through 7 are Impaired. Holders of Claims and Interests in Classes 3, 4 and 6 are permitted to vote to accept or reject the Plan. Holders of Claims and Interests in Classes 5 and 7 are conclusively presumed to reject the Plan. An Impaired Class of Claims that votes shall have accepted the Plan if (a) the Holders (other than any Holder designated by the Bankruptcy Court based on their vote or its solicitation not being in good faith under Bankruptcy Code section 1126(e)) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under Bankruptcy Code section 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Interests that votes shall have accepted the Plan if the Holders (other than any Holder designated under section 1126(e)) of at least two-thirds in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan.

## D.    Nonconsensual Confirmation

In the event any Class of Claims or Interests votes to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan notwithstanding such rejection pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims or Interests.

35

## E.     Postpetition Interest

Nothing in the Plan or the Disclosure Statement will be deemed to entitle the Holder of a Claim to receive postpetition interest on account of such Claim.

## X.

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.     Continued Corporate Existence and Vesting of Assets

The Debtors will, as the Liquidating Debtors, continue to exist on and after the Effective Date as separate corporate Entities, with all of the powers of corporations under the applicable non-bankruptcy law, and without prejudice to any right to alter or terminate their existence (whether by merger or otherwise), provided that the Liquidating Debtors' sole purpose from and after the Effective Date will be to make distributions to Creditors consistent with the Plan and to otherwise effectuate the Wind-Down. Except as otherwise provided in the Plan, on and after the Effective Date, all Distributable Assets and property of the Estates of the Debtors, including all Retained Rights of Action, and any property acquired by the Debtors under or in connection with the Plan will vest in the Liquidating Debtors free and clear of all Claims, Liens, charges, other encumbrances and Interests.

### B.     Retained Rights of Action

Unless a Right of Action or objection to Claim is, in writing, expressly waived, relinquished, released, assigned, compromised, or settled in the Plan, or in a Final Order, all rights with respect to such Retained Right of Action or objections to Claims are expressly preserved for the benefit of, and fully vested in, the Liquidating Debtors.

The Liquidating Debtors may pursue, or decline to pursue, the Retained Rights of Action and objections to Claims, as appropriate, in the business judgment of the Plan Representative and the Supervisory Board. The Liquidating Debtors may settle, release, sell, assign, otherwise transfer, or compromise, Retained Rights of Action and/or objections to Claims without need for notice or order of the Bankruptcy Court.

### C.     Corporate Governance

From and after the Effective Date, subject to the oversight of the Supervisory Board, the Liquidating Debtors shall be managed and administered through the Plan Representative, who shall be appointed as sole officer of each of the Liquidating Debtors, and shall have full authority to execute the provisions of the Plan. The initial Plan Representative shall be selected by the Debtors prior to the Confirmation Hearing, with the consent of the Support Parties. Any successor thereto shall be appointed by the Supervisory Board after the Effective Date in accordance with applicable corporate governance documents.

The Supervisory Board shall be appointed as directors for each of the Liquidating Debtors pursuant to 8 Delaware Code §303, with supervisory authority over the Plan Representative. The Supervisory Board shall consist of the following three (3) Persons: (a) one

36

designee of the Informal Committee; (b) one designee of Highland; and (c) one designee of GSC Partners. In the event that a member of the Supervisory Board can no longer carry out its duties as a director (by reason of death, resignation or disability) (the "Director Vacancy"), the party that designated such member (that is, either the Informal Committee, Highland, or GSC Partners, as applicable) shall appoint a successor designee within 90 days; provided, however, that if the Informal Committee, Highland or GSC Partners, as applicable, fails to designate a successor Supervisory Board Member within 90 days of such Director Vacancy, the Agent shall select the designee with the consent of the majority of First Lien Lenders; provided, further, however, that if Highland or GSC Partners is not a First Lien Lender, or the Informal Committee is disbanded, such party may not appoint a successor at the time of any such appointment, but rather such designee shall be appointed by the Agent with the consent of the majority of First Lien Lenders.

## D.   **Wind-Down**

The Liquidating Debtors, through the Plan Representative, shall make distributions to Creditors consistent with the Plan and otherwise hold and liquidate all Distributable Assets and property of the Estates for the benefit of Creditors, in accordance with the provisions of the Plan. The Liquidating Debtors, the Plan Representative, and the Supervisory Board shall not be required to post a bond in favor of the United States.

The Liquidating Debtors, acting through the Plan Representative, shall have the power and authority to perform the following acts (together, the "Wind-Down"), in addition to any powers granted by law or conferred by any other provision of the Plan and orders of the Bankruptcy Court; provided, however, that enumeration of the following powers shall not be considered in any way to limit or control the power of the Liquidating Debtors or the Plan Representative, subject to the authority of the Supervisory Board, to act as specifically authorized by any other provision of the Plan or orders of the Bankruptcy Court, and to act in such manner as the Plan Representative may deem necessary, or desirable to discharge all obligations assumed by the Liquidating Debtors as provided herein, and to conserve and protect the Distributable Assets, or to confer on Creditors the benefits intended to be conferred upon them by the Plan; including without limitation and by example only:

1.   Determine Tax issues or liabilities in accordance with Bankruptcy Code §505);

2.   Resolve any objections to the allowance or priority of Claims, Administrative Expenses or Interests;

3.   Resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense or Interest pursuant to the Plan;

4.   Distribute Cash in the Estates to Creditors consistent with the terms of the Plan;

5.   Perfect and secure the Liquidating Debtors' right, title and interest to property of the Estates;

37

6.     Recover and, to the extent possible, sell and convert the property of the Estates to Cash, and distribute the net proceeds consistent with the terms of the Plan;

7.     Manage and protect property of the Estates and distribute the net proceeds consistent with the terms of the Plan;

8.     Wind-up the affairs of the Debtors' subsidiaries and affiliates;

9.     Purchase or continue insurance to protect the Liquidating Debtors, the Plan Representative, and property of the Estates;

10.     Deposit Estate funds, draw checks and make disbursements thereof consistent with the terms of the Plan;

11.     Employ, retain and compensate, and discharge and dismiss, without further order of the Bankruptcy Court, Professional Persons as the Plan Representative may deem necessary or desirable to assist in fulfilling the purposes of the Plan, including the continued retention and payment of Professional Persons in connection with any ongoing litigation or other matter pursued or conducted by the Debtors;

12.     Commence or prosecute in the name of the Debtors (or any of them), any lawsuit or other legal or equitable action (except to the extent released pursuant to the terms of the Plan), including, without limitation, filing objections to or estimation of Claims, and prosecuting Retained Rights of Action, in any court of competent jurisdiction, which are necessary to carry out the terms and conditions of the Plan;

13.     Settle, compromise or adjust, pursuant to the standards of Bankruptcy Rule 9019 (which standards, but not a requirement for Bankruptcy Court approval, shall be deemed to apply to all post-Effective Date settlements), any disputes or controversies in favor of, or against, any Debtor;

14.     Incur and pay all Plan Expenses and any reasonable costs and expenses incident to the performance of the duties of the Liquidating Debtors and the Plan Representative under the Plan, including without limitation, rent for office space and storage, office supplies, travel and expense reimbursement, insurance, and other obligations;

15.     Prepare and file tax returns, as mandated by applicable local, state, federal and foreign law;

16.     Seek entry of a final decree at the appropriate time; and

17.     Take such other action as the Plan Representative may determine to be necessary or desirable to carry out the purpose of the Plan.

38

**E.      Funding for the Plan**

The Debtors' obligations under the Plan and the fees and expenses of the Liquidating Debtors will be funded out of existing Cash in the Estates.  Specifically, the sum of $500,000 will be set aside out of the Debtors' existing Cash to fund Plan Expenses and the Wind-Down. Any unused Cash set aside to fund Plan Expenses and the Wind-Down shall be distributed to the First Lien Lenders as First Lien Distributable Assets in accordance with the Plan.  Any additional Cash proceeds that may be realized by the Liquidating Debtors from and after the Effective Date shall be distributed to the First Lien Lenders as First Lien Distributable Assets in accordance with the Plan.

**F.      Substantive Consolidation**

In furtherance of the settlements contained in the Plan, the entry of the Confirmation Order shall constitute approval by the Bankruptcy Court, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, as of the Effective Date, of the substantive consolidation of the Debtors and their respective Estates, solely for purposes of voting and distributions under the Plan.  Pursuant to the Confirmation Order, on and after the Effective Date, (i) all Distributable Assets to be used for distributions to Creditors of any of the Debtors will be treated as though they were merged into the Liquidating Debtors; (ii) any obligation of any Debtor and all guarantees thereof executed by, or joint liability of, any of the Debtors will be treated as one obligation of the Liquidating Debtors for distribution purposes pursuant to the Plan; and (iii) any Claims filed against any Debtors shall be treated as a single Claim filed against the Liquidating Debtors for distribution purposes pursuant to the Plan.

Notwithstanding the foregoing, the substantive consolidation of the Debtors for voting and distribution purposes shall not affect or impair (i) any rights, Claims or remedies or defenses of (or between) the separate Debtors as of the Petition Date, including with respect to any Retained Rights of Action ; (ii) the legal and organizational structure of the Debtors, (ii) any Liens that are maintained, recognized, or preserved under the Plan; and (iii) claims under or with respect to any insurance policy of any Debtor (or any right to the proceeds of any such policy or policies).

The Plan shall be deemed to be a motion by the Debtors for substantive consolidation. Any objection by an affected Creditor to such consolidation shall be treated as an objection to Confirmation and shall be determined by the Bankruptcy Court in the context of considering Confirmation of the Plan.

**G.      Settlement of Intercompany Matters**

Upon the Effective Date, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, each Debtor and their successors and assigns waive, release and discharge each other and all of their respective successors from any and all Intercompany Claims and Rights of Action amongst and between any or all of the Debtors, which waiver, release and discharge shall be effective as a bar to all actions, causes of action, suits, Claims, Liens, or demands of any kind with respect to any Intercompany Claim or Right of Action amongst or between any or all of the Debtors.

As noted above, Nellson Holdings may have substantial Intercompany Claims against the other Debtors. At the same time, Nellson Holdings has few liabilities other than its obligations to the Holders of the Subordinated Debt Claims.

## H.   Settlement with the Lenders

Upon the Effective Date, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, all distributions to be made under the Plan (including the release of any Avoidance Claims) shall be in full satisfaction of, and represent a settlement of, all rights, disputes and claims held or asserted by the recipient of such distributions against the Debtors, their Estates, the Agent, any Lender, the Informal Committee or the Official Committee with respect to the Chapter 11 Cases, the Superpriority Claims, the Lender Claims, the General Unsecured Claims, the Committee Agreement, any intercreditor agreements between and among the First Lien Lenders and the Second Lien Lenders, and the valuation of the unencumbered portion of the common stock of Nellson Nutraceutical Canada, Inc. In consideration and settlement of the Lender Claims in accordance with the Plan and any other disputes that may exist between the Lenders and the Debtors, the Agent and each Holder of a Lender Claim shall be deemed released of any Rights of Action held by the Debtors, their Estates, and the Official Committee and its members (acting in such capacity), including without limitation any Rights of Action that might otherwise be asserted by the Official Committee or its members under the Committee Agreement. Further, each Holder of a Lender Claim that executes the Lender Release shall be deemed released of any Rights of Action held by the Agent upon execution of the Agent Release, the Executives who execute the Executive Release, and the Holders of Subordinated Debt Claims upon execution of the Subordinated Debt Holder Release.

## I.   Settlement with Holders of Subordinated Debt Claims

Upon the Effective Date, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration and settlement of (a) all rights of Holders of Subordinated Debt Claims against Nellson Holdings, including but not limited to any rights of Nellson Holdings to assert Intercompany Claims, and (b) all Claims and Administrative Expenses asserted by Holders of Subordinated Debt Claims against any of the Debtors, the Holders of the Subordinated Debt Claims shall be deemed released of any Rights of Action held by the Debtors, their Estates, the Agent upon execution of the Agent Release (and subject to the terms of the Agent Release), the Lenders that execute the Lender Release (and subject to the terms of the Lender Release), and the Official Committee and its members (acting in such capacity), provided that each Holder of an Allowed Subordinated Debt Claim executes the Subordinated Debt Holder Release. The Holders of Allowed Subordinated Debt Claims shall receive no distributions or recoveries on account of such Claims other than the releases contemplated under the Plan.

## J.   Settlement with Debtors' Officers and Directors; Disallowance of Indemnification Claims

Upon the Effective Date, pursuant to sections 502(e)(1)(B) and 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, (i) all Indemnification Claims of all of the Executives shall be disallowed, provided however, that such disallowance shall not impair the

40

right of any Executive as an insured to obtain proceeds from any applicable insurance coverage on account of such Claims; and (ii) in consideration and settlement of the foregoing, each Executive that executes the Executive Release shall be deemed released of any Rights of Action held by the Debtors, their Estates, the Agent upon execution of the Agent Release (and subject to the terms of the Agent Release), the Lenders that execute the Lender Release (and subject to the terms of the Lender Release), the Holders of Subordinated Debt Claims upon execution of the Subordinated Debt Holder Release (and subject to the terms of the Subordinated Debt Holder Release), and the Official Committee and its members (acting in such capacity).

## K. Corporate Action/Dissolution

On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including but not limited to, actions requiring a vote or other approval of the board of directors or shareholders or execution of all documentation incident to the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers and directors of the Debtors. On the Effective Date, all officers and directors of the Debtors shall be deemed removed from such positions and the Debtors' charters shall be deemed amended to prohibit (1) the issuance of nonvoting equity securities, or (2) the existence of securities possessing an inappropriate distribution of voting power, all as more specifically required and described in section 1123(a)(6) of the Bankruptcy Code.

Upon entry of a final decree, the Liquidating Debtors shall be deemed dissolved and wound up without any further action required by the Liquidating Debtors and the Debtors' shareholders or boards of directors.

## L. Interests in Affiliates and Subsidiaries

As of the Effective Date, except as expressly provided in the Plan, the Liquidating Debtors shall retain any stock or interests they may hold in their subsidiaries or affiliates and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests. After the Effective Date, any Liquidating Debtor may sell, transfer, assign or otherwise dispose of such shares or interests as permitted by applicable law.

## M. Payment of Plan Expenses

The Liquidating Debtors may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court; provided, however, that copies of monthly invoices of the Plan Expenses, including the fees and expenses of professionals, shall be provided to the Support Parties for review. The Support Parties shall have fifteen (15) days after receipt of the invoices to object to such invoices (which objection should be in writing and delivered to the Liquidating Debtors). The Liquidating Debtors and the objecting party shall seek to resolve any objection within ten (10) days of such objection and, if the objection cannot be resolved, either the Liquidating Debtors or the objecting party shall be permitted to seek a ruling by the Bankruptcy Court as to the reasonableness of such fees and/or expenses on at least five (5) business days notice. If the Support Parties do not object to the

41

monthly invoice(s), or object only to a portion of the invoice(s), within the foregoing fifteen (15) day period, the Liquidating Debtors shall be entitled to pay the monthly invoice(s) for those fees and expenses for which there is no objection.

**N.**   **Dissolution of the Official Committee**

As of the Effective Date, the Official Committee shall withdraw from the pending appeal of the MIP Order with prejudice and thereupon the Official Committee shall be dissolved, provided however, that notwithstanding such dissolution the Official Committee's professionals may seek payment of any unpaid Administrative Expenses pursuant to the Plan.

## XI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**   **Rejection of Executory Contracts and Unexpired Leases**

Except for any executory contracts or unexpired leases: (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to Confirmation; or (iii) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estates, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to it own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. The Confirmation Order shall constitute an Order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

**B.**   **Bar Date for Rejection Damages**

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Liquidating Debtors or their Estates unless a proof of Claim is filed and served on the Debtors and their counsel within 30 days after the earlier of (a) Confirmation or (b) service of a notice that the executory contract or unexpired lease has been rejected. All such Claims for which proofs of Claim are required to be filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Plan.

## XII.

## DISTRIBUTIONS AND RELATED MATTERS

**A.**   **Dates of Distribution**

The sections of the Plan on treatment of Administrative Expenses, Claims, and Interests specify the times for distributions. Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead

be made, without interest, on the immediately following Business Day. Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.

If, under the terms of the Plan, the resolution of a particular Disputed Claim, *e.g.,* it is Disallowed, entitles other Holders of Claims to a further distribution, either (a) the Liquidating Debtors may make such further distribution as soon practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith, by the Liquidating Debtors to be less than $100 for any Creditor, then, in order to afford the Liquidating Debtors an opportunity to minimize costs and aggregate such distributions, the Liquidating Debtors may make such further distribution any time prior to sixty (60) days after the Final Resolution Date.

**B.      Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Liquidating Debtors, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**C.      Rounding of Payments**

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent. To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as "Unclaimed Property" under the Plan.

**D.      Disputed Claims**

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Administrative Expenses under the Plan, including the determination of the amount or number of distributions due to the Holders of Allowed Claims and Allowed Administrative Expenses, each Disputed Claim shall be treated as if it were an Allowed Claim or Allowed Administrative Expense, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Debtors), such amount or number as determined by the Bankruptcy Court shall be used as to such Claim.

Distributions of non-Cash consideration due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.

After an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim, Allowed Interest or Allowed Administrative Expense shall be made by the Liquidating Debtors. Such distribution shall be made within forty-five (45) days of the date that the Disputed Claim becomes an Allowed Claim or Allowed Administrative Expense. No interest shall be due to a

43

Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest or Administrative Expense.

**E.    Undeliverable and Unclaimed Distributions**

If any distribution under the Plan is returned to the Liquidating Debtors as undeliverable or the check or other similar instrument or distribution by the Liquidating Debtors remains uncashed or unclaimed, as applicable, for one hundred twenty (120) days, such Cash shall be deemed to be "Unclaimed Property." Upon property becoming Unclaimed Property, it immediately shall be revested in the Liquidating Debtors.

Pending becoming Unclaimed Property, such Cash will remain in the possession of the Liquidating Debtors, and, if the Liquidating Debtors are notified in writing of a new address for the relevant Holder, they shall cause distribution of the Cash within forty-five (45) days thereafter.

Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder which may otherwise be due under the Plan will accrue or be held for such Holder, provided that, if the applicable agent is notified in writing of such Holder's then-current address and status as a Holder under the Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

**F.    Compliance with Tax Requirements**

The Liquidating Debtors shall comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities in connection with making distributions pursuant to the Plan.

In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Liquidating Debtors shall file such information return with the IRS and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law. With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Liquidating Debtors, the Liquidating Debtors may, in their sole option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received; provided, however, that the Liquidating Debtors shall not be obligated to liquidate any securities to perform such withholding.

**G.    Record Date in Respect to Distributions**

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, shall be the same as the Record Date.

44

At the date and time of the Record Date, the Agent's registers with respect to the Lender Claims shall be deemed closed for purposes of determining whether a Holder of a Lender Claim is a record holder entitled to distributions under the Plan. Neither the Liquidating Debtors nor the Agent shall have any obligation to recognize, for purposes of distributions pursuant to or in any way arising under the Plan, any Lender Claim or claim arising therefrom or in connection therewith that is transferred after the time of the Record Date. Instead, they all shall be entitled to recognize and deal for distribution purposes with only those record holders of the Lender Claims as of the Record Date irrespective of the number of distributions to be made under the Plan or the date of such distributions.

**H.      Reserves**

In making any distributions in respect of Claims under the Plan, the Liquidating Debtors shall reserve an appropriate and adequate amount of Cash on account of any unresolved Disputed Claims. The Liquidating Debtors shall make a corrective distribution following the successful resolution of any Disputed Claim on the earlier of the next regularly scheduled distribution date or each six month anniversary of the Effective Date.

## XIII.

## LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES

**A.      Litigation; Objections to Claims; Objection Deadline**

Except as may be expressly provided otherwise in the Plan, the Liquidating Debtors shall be responsible for pursuing Retained Rights of Action, any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

As of the Effective Date, the Liquidating Debtors shall have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims. Unless another date is established by the Bankruptcy Court (which may so act without notice or hearing) or is established by other provisions of the Plan, any objection to a Claim shall be filed with the Bankruptcy Court and served on the Person holding such Claim within ninety (90) days after the Effective Date (the "Objection Deadline"), provided that the Liquidating Debtors may seek extension(s) thereof subject to Bankruptcy Court approval.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities, the Liquidating Debtors, at any time, may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to: (1) any Tax issue or liability relating to an act or event occurring prior to the Effective Date; or (2) any Tax liability arising prior to the Effective Date. If the Liquidating Debtors utilize section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court shall determine the amount of the subject Tax liability in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Liquidating Debtors shall be entitled to such discharge which shall apply to any and all Taxes relating to the period covered by such return.

45

## B. Temporary or Permanent Resolution of Disputed Claims

The Liquidating Debtors may request, at any time prior to the Effective Date or on and after the Effective Date, that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Disputed Claim, the Liquidating Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim. In addition, the Liquidating Debtors may resolve or adjudicate any Disputed Claim in the manner in which the amount of such Claim, Interest or Administrative Expense and the rights of the Holder of such Claim, Interest or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced. All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

## C. Setoffs

The Liquidating Debtors may, pursuant to sections 553 or 558 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim, Interest or Administrative Expense and the distributions to be made pursuant to the Plan on account of such Claim, Interest or Administrative Expense (before any distribution is made on account of such Claim, Interest or Administrative Expense), the Retained Rights of Action of any nature that the Liquidating Debtors may hold against the Holder of such Allowed Claim, Interest or Administrative Expense. Neither the failure to set off nor the allowance of any Claim, Interest or Administrative Expense hereunder will constitute a waiver or release by the Liquidating Debtors of any such Retained Rights of Action that the Liquidating Debtors may have against such Holder.

## D. Preservation of Retained Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Debtors, and their successors, any assigns hereunder and future assigns will retain and may exclusively enforce any Retained Rights of Action and the Confirmation Order shall be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Retained Rights of Action. Absent such express waiver or release, the Liquidating Debtors or their successors or assigns may pursue Retained Rights of Action, as appropriate, in accordance with the best interests of the Liquidating Debtors (or their successors or future assigns). The Retained Rights of Action may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Plan, nothing in the Plan shall (or is intended to) prevent, estop or be deemed to preclude the Debtors from utilizing, pursuing,

46

prosecuting or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Rights of Action upon or after Confirmation or Consummation.

## XIV.

## RELEASE, WAIVER AND RELATED PROVISIONS

### A.    Injunctions

#### 1.    Generally

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Cases pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date. From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, (a) seeking to hold (i) the Liquidating Debtors or (ii) the property of the Liquidating Debtors, liable for any Claim, obligation, right, interest, debt or liability that has been discharged or released pursuant the Plan.

#### 2.    Injunction Related to Rights of Action and Terminated Claims, Administrative Expenses or Interests

Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Superpriority Claim, Interest or other debt or liability that is stayed, Impaired or terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions either (x) against the Debtors, the Liquidating Debtors or their property on account of all or such portion of any such Claims, Administrative Expenses, Superpriority Claims, Interests, debts or liabilities that are stayed, Impaired or terminated or (y) against any Person with respect to any Right of Action or any objection to a Claim, Administrative Expense, Superpriority Claim or Interest, which Right of Action or objection, under the Plan, is waived, released or exclusively retained by any of the Debtors:  (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.  To avoid any doubt, except as otherwise expressly noted in the Plan, nothing in the Plan or herein shall be construed or is intended to affect, enjoin, modify, release or waive any claims, rights, and actions that a third party may have against a person other than the Debtors or the Liquidating Debtors, provided that such claims, rights, and actions are wholly separate and exist independently from any claims, rights and actions of the Estates.

47

**B.** **Exculpation**

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, including the consideration provided under the Plan, each of the Debtors and their Representatives, the Liquidating Debtors, the Plan Representative, the members of the Official Committee (acting in such capacity), the Official Committee's Representatives, the Agent and its Representatives upon execution of the Agent Release, the members of the Informal Committee (acting in such capacity), the Informal Committee's Representatives, and the Holders of the Subordinated Debt Claims and their Representatives upon execution of the Subordinated Debt Holder Release, shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

**C.** **Estate Releases of Executives, Lenders, and Holders of Subordinated Debt Claims**

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, including the consideration provided under the Plan, and as part of the settlement and compromise as described herein and the Disclosure Statement, each of the Debtors, for themselves and the Estates, the Official Committee and its respective members (acting in such capacity) shall irrevocably, unconditionally and generally release each Executive that executes an Executive Release, the Agent upon execution of the Agent Release, each Lender, the Informal Committee and its members (acting in such capacity), each Holder of a Subordinated Debt Claim that executes a Subordinated Debt Holder Release, and each of the foregoing parties' Representatives (together, the "Released Parties"), from any and all actions, causes of action, Rights of Action, suits, debts, dues, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, proceedings and demands of whatsoever character, nature and kind, in law, admiralty or equity, including but not limited to claims based on statute, common law, public policy, contract (whether oral or written, express or implied) or tort law, which such Person or Entity ever had, now have or hereafter can, shall or may have against any of the Released Parties from the beginning of the world to the Effective Date that in any way relates to any of the Debtors, the Estates or the Chapter 11 Cases.

**D.** **Estate Release of Avoidance Claims**

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, including the consideration provided under the Plan, each of the Debtors, for themselves and the Estates, shall irrevocably, unconditionally and generally release any and all Avoidance Claims against any Person or Entity, and the Debtors shall take any and all appropriate and reasonable actions to dismiss any pending Avoidance

48

**Claims with prejudice. The foregoing release shall have no effect whatsoever on the Retained Rights of Action.**

## XV.

## PENSION PLANS, OTHER RETIREE BENEFITS AND LABOR CONTRACTS

The Debtors are not obligated pursuant to section 1129(a)(13) of the Bankruptcy Code to pay any "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code).

## XVI.

## NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL

The Debtors do not charge any rates for purposes of section 1129(a)(6) that are regulated by any governmental regulatory commission with jurisdiction under applicable non-bankruptcy law.

## XVII.

## EXEMPTION FROM CERTAIN TRANSFER TAXES

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers by the Debtors or the Liquidating Debtors pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar Tax or governmental assessment.

## XVIII.

## RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS

A.     **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and any of the proceedings related to the Chapter 11 Cases pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out. Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

       a.       establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim, Administrative Expense or Interest (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with Bankruptcy Code §505), resolve any objections to the allowance or priority of Claims, Administrative Expense or Interests, or resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense or Interest pursuant to the Plan;

49

b.        grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

c.        resolve any matters related to the rejection of any executory contract or unexpired lease to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

d.        ensure that distributions to Holders of Allowed Claims, Administrative Expenses or Interests are made pursuant to the provisions of the Plan, and to effectuate performance of the provisions of the Plan;

e.        decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending before the Effective Date or that may be commenced thereafter as provided in the Plan;

f.        enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or vacated;

g.        resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

h.        subject to the restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

50

i.  issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan or the Confirmation Order,

j.  consider and act on the compromise and settlement of any Claim against, or Retained Right of Action of the Debtors;

k.  decide or resolve any Retained Rights of Action under the Bankruptcy Code;

l.  enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Debtors wherever located;

m.  hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Chapter 11 Cases, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, and (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Debtors;

n.  determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

o.  enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings issued or entered in connection with the Chapter 11 Cases or the Plan;

p.  remand to state court any claim, cause of action, or proceeding involving the Debtors that was removed to federal court in whole or in part in reliance upon 28 U.S.C. § 1334;

q.  determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

r.  determine any other matter not inconsistent with the Bankruptcy Code; and

s.  enter an order or final decree concluding the Chapter 11 Cases.

51

# XIX.

## REQUIREMENTS FOR CONFIRMATION

### A. Acceptances Necessary to Confirm Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by each Impaired Class. Under section 1126 of the Bankruptcy Code, an Impaired Class of Claims is deemed to have accepted a plan if a plan has been accepted by creditors of that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected the plan. Similarly, an Impaired Class of Interests is deemed to have accepted a plan if the plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed equity interests of such class held by holders of such interests that have accepted or rejected the plan.

Voting rights are set forth as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 – Priority Non-Tax Claims | Unimpaired | Not entitled to vote. |
| Class 2 – Other Secured Claims | Unimpaired | Not entitled to vote. |
| Class 3 – First Lien Lender Claims | Impaired | Entitled to vote. |
| Class 4 – Second Lien Lender Claims | Impaired | Entitled to vote. |
| Class 5 – General Unsecured Claims | Impaired | Not entitled to vote. |
| Class 6 – Subordinated Debt Claims | Impaired | Entitled to vote. |
| Class 7 – Interests in the Debtors | Impaired | Not entitled to vote. |

### B. Best Interest of Creditors Test

Confirmation requires, among other thing, that each holder of a claim in an Impaired class and each holder of an equity interest either: (a) accepts the Plan; or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is commonly referred to as the "best interests test."

#### a. Chapter 7

To determine the value that the Holders of Impaired Claims and Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. Section 704 of the Bankruptcy Code requires a chapter 7 trustee to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

Here, the Cash available in chapter 7 cases for satisfaction of Allowed Claims would consist of the proceeds resulting from the liquidation of the Debtors' Estates, augmented by the Cash, if any, held by the Debtors at the time of the commencement of the chapter 7 case(s). Any

such Cash amount would then be reduced by the amount of any Claims secured by such assets such as the Secured Claims, the costs and expenses of the liquidation of the Assets, and such additional Administrative Claims, and other Priority Claims, that may result from the use of chapter 7 for the purposes of liquidation.

The costs of liquidation under chapter 7 would include fees payable to trustee(s) in bankruptcy, as well as those that might be payable to his or her attorneys, and to other professionals that such trustee(s) may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases that would be allowed as a priority in the chapter 7 cases, such as compensation for attorneys, appraisers, accountants or other professionals, and costs and expenses of the Debtors and the Official Committee. Such Administrative Expenses from the chapter 7 cases would have to be paid in Cash in full from the liquidation proceeds before the balance of those proceeds could be made available to pay prepetition Claims.

b.    **Liquidation Alternative**

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an Impaired Class, the Debtors must demonstrate, and the Bankruptcy Court must determine that with respect to such Class, each Holder of a Claim will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

The Plan satisfies this standard. The Plan provides greater recovery to the Holders of Allowed Claims than such Holders would receive under a liquidation under chapter 7 primarily because the Plan avoids a layer of administrative expense associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administering the Debtors' assets for the benefit of Creditors. Most obviously, the Plan incorporates the terms of a comprehensive settlement amongst a diverse set of creditor constituents and equity holders that has the potential to save the Estates millions of dollars in litigation costs and to avoid the delays and risks associated therewith. The Settlement also provides various non-Cash benefits to Creditors that are difficult to quantify, such as global releases. **The Plan therefore has the support of all major constituencies in these Chapter 11 Cases, including the Agent, the Informal Committee, and the Official Committee.**

Moreover, in a chapter 7 case, the chapter 7 trustee would also be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtors have already accumulated much of the funds and have already incurred many of the expenses associated with generating those funds. Accordingly, the Debtors believe that there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by the Debtors, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed, including possibly substantial funds handed over to the chapter 7 trustee by the Debtors. It is also anticipated that a chapter 7 liquidation would result in delay in distributions to Creditors. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the case to chapter 7. Fed. R. Bankr. P. 3002(c). Hence, a chapter 7 liquidation would not only delay distributions, but

raise the prospect of additional Claims that were not asserted in the Chapter 11 Cases. Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Creditors.

## C. Feasibility of Plan

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation, that the Bankruptcy Court find that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the plan, unless such liquidation or reorganization is proposed under the plan. This requirement is called "feasibility."

The Plan is feasible because the Debtors have sufficient Cash on hand, as set forth in Exhibit 4, to satisfy all of the Debtors' obligations under the Plan.

## D. Classification

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of Claims. Section 1122(a) permits a plan to place a claim or equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or interests in that class. The Debtors believe that the classification of Claims and Interests under the Plan is appropriate and consistent with applicable law.

## E. Confirmation of Plan Without Necessary Acceptances; Cramdown

A COURT MAY CONFIRM A PLAN, EVEN IF IT IS NOT ACCEPTED BY ALL IMPAIRED CLASSES, IF THE PLAN HAS BEEN ACCEPTED BY AT LEAST ONE IMPAIRED CLASS OF CLAIMS, AND THE PLAN MEETS THE "CRAMDOWN" REQUIREMENTS SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE. SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES THAT THE BANKRUPTCY COURT FIND THAT A PLAN IS "FAIR AND EQUITABLE," AND DOES NOT "DISCRIMINATE UNFAIRLY" WITH RESPECT TO EACH NON-ACCEPTING IMPAIRED CLASS OF CLAIMS OR INTERESTS. IN THE EVENT THAT ANY IMPAIRED CLASS REJECTS THE PLAN, IN ACCORDANCE WITH SECTION 1129(a)(8) OF THE BANKRUPTCY CODE, AND AT LEAST ONE IMPAIRED CLASS HAS VOTED TO ACCEPT THE PLAN, THE DEBTORS INTEND TO REQUEST THAT THE BANKRUPTCY COURT CONFIRM THE PLAN IN ACCORDANCE WITH THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE BANKRUPTCY CODE, OR MODIFY THE PLAN IN ACCORDANCE WITH THE TERMS THEREOF.

The Plan provides for the possibility of invoking the "cramdown" provisions as defined in section 1129(a) of the Bankruptcy Code. Under this provision, the Bankruptcy Court has the authority to confirm the Plan even though a Class of Claims that is Impaired does not vote to accept the Plan, if another Class of Claims, which is also Impaired, votes to accept the Plan. This provision does not take into account the possibility that one large claimant or several claimants may arbitrarily vote not to accept the Plan that would be detrimental to other Creditors. In this instance the Bankruptcy Court, notwithstanding the negative vote, in the interest of being

54

"fair and equitable," may confirm the Plan. Such determination, if necessary, would be addressed at the Confirmation Hearing.

### a. No Unfair Discrimination

With respect to a dissenting class of interests, the "fair and equitable" standard requires that the Plan contain one of two elements. It must provide either (i) that each holder of an interest in the class receive or retain property having a value, as of the effective date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such interests or (ii) that no aggregate of an interest in any junior class receive or retain any property on account of such interests. The strict requirement of the allocation of full value to dissenting classes before junior classes can receive distribution is known as the "absolute priority rule."

The Debtors believe that under the Plan: (i) all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests with which their legal rights are intertwined, if any; and (ii) no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. The Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class.

### b. Fair and Equitable Test

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and interests as follows:

#### (i) Secured Claims

Either: (i) each holder of a secured claim (x) retains the lien securing its secured claim and receives on account of its allowed secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, or (y) realizes the "indubitable equivalent" of its allowed secured claim; or (ii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds, and the liens against such proceeds are treated in accordance with clause (i).

#### (ii) Unsecured Claims

Either: (i) each holder of an unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims or the non-accepting class do not receive any property under the plan on account of such claims and interests.

#### (iii) Equity Interests

Either: (i) such holder of an interest receives or retains property of a value equal to the greater of any fixed liquidation preference or fixed redemption price to which such holder is entitled, or the value of the interest; or (ii) the holder of any interests junior to the interests in the impair class will not receive or retain any property under the plan.

55

The cramdown provisions of the Bankruptcy Code are complex and this summary is not intended to be a complete statement of the law in this area.

## XX.

## EFFECT OF CONFIRMATION

### A.    Binding Effect of Confirmation

Confirmation will bind the Debtors, all Holders of Claims, Administrative Expenses, Superpriority Claims or Interests and other parties in interest to the provisions of the Plan whether or not the Claim, Administrative Expense, Superpriority Claim or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense, Superpriority Claim or Interest has accepted the Plan.

### B.    Good Faith

Confirmation of the Plan shall constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

### C.    No Limitations on Effect of Confirmation

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

## XXI.

## RISK FACTORS

The principal risk associated with the Plan is that it may not be confirmed by the Bankruptcy Court, either because the requisite votes in favor of the Plan are not received or the Bankruptcy Court decides not to confirm the Plan on some other basis.

## XXII.

## CERTAIN FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to Holders of Claims and Interests. This discussion is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Interests, the Holder's

56

status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or the Holders of Claims or Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies and foreign taxpayers). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.   <u>Consequences to Debtors</u>

The United States federal income tax consequences of the distributions contemplated by the Plan to the Holders of Claims that are United States Persons will depend upon a number of factors. For purposes of the following discussion, a "United States Person" is any person or entity (1) who is a citizen or resident of the United States, (2) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to United States federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control; or (b) that has elected to continue to be treated as a United States Person for United States federal income tax purposes. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. United States Persons who are partners in a partnership should consult their tax advisors. A "Non-United States Person" is any person or entity that is not a United States Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" shall mean a Holder of a Claim that is a United States Person.

The United States federal income tax consequences to Holders and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder

57

acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the method of tax accounting of the Holder; and (7) whether the Claim is an installment obligation for United States federal income tax purposes. Certain Holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers and tax-exempt organizations) may be subject to special rules not addressed in this summary of United States federal income tax consequences. There also may be state, local, and/or foreign income or other tax considerations or United States federal estate and gift tax considerations applicable to Holders of Claims, which are not addressed herein. EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE PLAN.

### 1.    Holders of Claims.

A Holder who received Cash (or potentially other consideration with respect to any Holders of Class 1, 2, 3 and 4 Claims) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

### 2.    Non-United States Persons.

A Holder of a Claim that is a Non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effective connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### 3.    Importance of Obtaining Professional Tax Assistance.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY

DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XXIII.

## ALTERNATIVES TO PLAN

The Debtors believe that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include: (a) conversion of the Chapter 11 Cases to chapter 7; (b) dismissal of the Debtors' cases; or (c) an alternative plan of reorganization.

### A.      Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. For the reasons previously discussed above, the Debtors believe that Confirmation of the Plan will provide Creditors with a recovery that is expected to be substantially more than could be achieved in a liquidation under chapter 7 of the Bankruptcy Code.

### B.      Dismissal

Dismissal of the Chapter 11 Cases would leave the Debtors' secured creditors in position to exercise their state law rights under their existing security interests, including foreclosure of such liens. The Debtors do not believe that this alternative is in the best interests of the Estates.

### C.      Alternative Plan

The Debtors believe that any alternative plan would not result in as favorable of treatment of Claims and Interests as proposed under the Debtors' Plan.

### D.      No Res Judicata Effect

Notwithstanding anything to the contrary in the Plan, or in this Disclosure Statement, the provisions of this Disclosure Statement, and the Plan, which permits the Liquidating Debtors to enter into settlements and compromises of any potential litigation, shall not have and are not intended to have any res judicata effect with respect to any prepetition Claims and causes of action that are not otherwise treated under the Plan, and shall not be deemed a bar to asserting such Claims and causes of action.

## XXIV.

## CONCLUSION

The Debtors believe that the Plan is in the best interest of Creditors and urges Creditors to vote to accept the Plan.

/s/ F. Duffield Meyercord
F. DUFFIELD MEYERCORD
Director and Sole Officer of Debtors and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
Richard M. Pachulski (CA Bar No. 90073)
Brad R. Godshall (CA Bar No. 105438)
Maxim B. Litvak (CA Bar No. 215852)
Rachel Lowy Werkheiser (Bar No. 3753)
919 North Market Street, Seventeenth Floor
Post Office Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Counsel to Debtors and Debtors in Possession

59903-002\DOCS_SF:59544.4